MR. AL FISHER #J-42468
D-6-216
P.O. BOX 1050
SOLEDAD, CA 93960

# FILED

SEP 11 2023

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY _____
        DEPUTY CLERK

1  IN THE UNITED STATES
2  DISTRICT COURT FOR THE
3  EASTERN DISTRICT OF CALIFORNIA,
4
5  AL GENE FISHER, JR.,          CASE NO: 2:22-CV-01952-JDP (PC)
6        PLANTIFF
7    V.                          FIRST AMENDED COMPLAINT FOR
8  GAYLEN, et al.,               DAMAGES; DEMAND FOR JURY TRIAL.
9        DEFENDANTS
10
11            I. JURISDICTION
12
13 (1.) THIS CIVIL ACTION AUTHORIZED BY 42 U.S.C. SECTION
14 1983 TO REDRESS THE DEPRAVATION, UNDER COLOR OF LAW,
15 OF RIGHTS SECURED BY THE CONSTITUTION OF THE UNITED
16 STATES. THE COURT HAS JURISDICTION UNDER 28 U.S.C. SECTION
17 1331 AND 1343 (a), (3). PLANTIFF SEEKS DECLATORY RELIEF PURSUANT
18 TO 28 U.S.C. SECTION 2201 AND 2022.
19
20 (2.) THE UNITED STATES DISTRICT COURT FOR THE EASTERN
21 DISTRICT OF CALIFORNIA IS AN APPROIATE VENUE UNDER 28 U.S.C.
22 SECTION 1391 (b)(2) BECAUSE IT IS WHERE THE EVENTS GIVING
23 RISE TO THIS CLAIM OCCURRED.
24
25            II. PLANTIFF
26 (3.) PLANTIFF, AL GENE E FISHER, JR. IS AND WAS AT ALL TIMES
27 MENTIONED HEREIN A PRISONER OF THE STATE OF CALIFORNIA
28 IN THE CUSTODY OF THE CALIFORNIA DEPARTMENT OF CORRECT—

1  IONS AND REHABILITATION. HE IS CURRENTLY HOUSED IN

2  SALINAS VALLEY STATE PRISON.

3

4           III. DEFENDANTS

5  (4.) DEFENDANT GAYLEN IS A CORRECTIONAL OFFICER OF THE

6  DEPARTMENT OF CALIFORNIA CORRECTIONS AND REHABILITATION

7  WHO, AT ALL TIMES MENTIONED IN THIS COMPLAINT HELD THAT

8  POSITION AND WAS ASSIGNED TO CALIFORNIA STATE PRISON SACRA—

9  MENTO.

10

11  (5.) DEFENDANT NGUYEN IS A CORRECTIONAL OFFICER OF THE

12  CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION

13  WHO, AT ALL TIMES MENTIONED IN THIS COMPLAINT HELD THAT

14  POSITION AND WAS ASSIGNED TO CALIFORNIA STATE PRISON

15  SACRAMENTO.

16

17  (6.) DEFENDANT ABARCA IS A CORRECTIONAL LIEUTENANT

18  OF THE DEPARTMENT OF CORRECTIONS AND REHABILITATION

19  WHO, AT ALL TIMES MENTIONED IN THIS COMPLAINT HELD THE

20  RANK OF CORRECTIONAL LIEUTENANT AND WAS ASSIGNED

21  TO CALIFORNIA STATE PRISON SACRAMENTO.

22

23  (7.) DEFENDANT AGUILAR IS A CORRECTIONAL SERGEANT

24  OF THE DEPARTMENT OF CORRECTIONS AND REHABILITATION WHO,

25  AT ALL TIMES MENTIONED IN THIS COMPLAINT HELD THE

26  RANK OF CORRECTIONAL SERGEANT AND WAS ASSIGNED

27  TO CALIFORNIA STATE PRISON SACRAMENTO.

28

1  (8.) DEFENDANT URIBE IS A CORRECTIONAL SERGEANT OF
2  THE DEPARTMENT OF CALIFORNIA DEPARTMENT OF CORRECTIONS
3  AND REHABILITATION WHO, AT ALL TIMES MENTIONED IN THIS
4  COMPLAINT HELD THE RANK OF CORRECTIONAL SERGEANT
5  AND WAS ASSIGNED TO CALIFORNIA STATE PRISON SACRAMENTO.
6
7  (9.) DEFENDANT KURGAN IS A CORRECTIONAL OFFICER OF
8  THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
9  WHO, AT ALL TIMES MENTIONED IN THIS COMPLAINT HELD THE
10  RANK OF CORRECTIONAL SERGEANT AND WAS ASSIGNED TO
11  CALIFORNIA STATE PRISON, SACRAMENTO.
12
13  (10.) DEFENDANT M. DIAZ IS A CORRECTIONAL OFFICER OF
14  THE CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITAT-
15  ION WHO, AT ALL TIMES MENTIONED IN THIS COMPLAINT HELD
16  THE POSITION OF CORRECTIONAL OFFICER AND WAS ASSIGNED
17  TO CALIFORNIA STATE PRISON SACRAMENTO.
18
19  (11.) DEFENDANT GUERRA IS A CORRECTIONAL OFFICER OF THE
20  CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITATION
21  WHO, AT ALL TIMES MENTIONED IN THIS COMPLAINT HELD THE
22  POSITION OF CORRECTIONAL OFFICER AND WAS ASSIGNED TO
23  CALIFORNIA STATE PRISON SACRAMENTO.
24
25  (12.) DEFENDANT MARTELL IS A CORRECTIONAL OFFICER OF THE
26  CALIFORNIA DEPARTMENT OF CORRECTIONS AND REHABILITAT-
27  ION WHO, AT ALL TIMES MENTIONED IN THIS COMPLAINT HELD
28  THE POSITION OF CORRECTIONAL OFFICER AND WAS ASSIGNED TO

1  CALIFORNIA STATE PRISON SACRAMENTO.

2

3  (13.) DEFENDANT TAPIA IS A CORRECTIONAL OFFICER OF THE

4  DEPARTMENT OF          CORRECTIONS AND REHABILITATION

5  WHO, AT ALL TIMES MENTIONED IN THIS COMPLAINT HELD THE

6  POSITION OF CORRECTIONAL OFFICER AND WAS ASSIGNED TO

7  CALIFORNIA STATE PRISON SACRAMENTO.

8

9  (14.) DEFENDANT MARTIN IS A CORRECTIONAL OFFICER OF

10  THE DEPARTMENT OF CORRECTIONS AND REHABILITATION WHO,

11  AT ALL TIMES MENTIONED IN THIS COMPLAINT WAS ASSIGNED

12  TO CALIFORNIA STATE PRISON SACRAMENTO AND HELD THAT POSITION.

13

14  (15.) DEFENDANT SHULTZ IS A CORRECTIONAL OFFICER OF THE

15  DEPARTMENT OF CORRECTIONS AND REHABILITATION WHO, AT ALL

16  TIMES MENTIONED IN THIS COMPLAINT WAS ASSIGNED TO

17  CALIFORNIA STATE PRISON SACRAMENTO AND HELD THAT POSITION.

18

19  (16.) DEFENDANT STIGELMEYER IS A CORRECTIONAL LIEUTEN-

20  ANT OF THE DEPARTMENT OF CORRECTIONS AND REHABILITATION

21  WHO, AT ALL TIMES MENTIONED IN THIS COMPLAINT HELD THE

22  RANK OF CORRECTIONAL LIEUTENANT AND WAS ASSIGNED TO

23  CALIFORNIA STATE PRISON SACRAMENTO.

24

25  (17.) DEFENDANT A. DIAZ IS A CORRECTIONAL OFFICER OF THE

26  DEPARTMENT OF CORRECTIONS AND REHABILITATION WHO, AT

27  ALL TIMES MENTIONED IN THIS COMPLAINT HELD THE POSITION

28  OF CORRECTIONAL OFFICER ASSIGNED TO CALIFORNIA STATE PRISON

1 SACRAMENTO.

2

3 (18.) DEFENDANT JOSEPH IS A CORRECTIONAL OFFICER OF THE
4 DEPARTMENT OF CORRECTIONS AND REHABILITATION WHO, AT ALL
5 TIMES MENTIONED IN THIS COMPLAINT HELD THE POSITION
6 OF  CORRECTIONAL OFFICER AND WAS ASSIGNED TO
7 CALIFORNIA STATE PRISON SACRAMENTO.

8

9 (19.) DEFENDANT KENDALL IS A CORRECTIONAL OFFICER ( I
10 BELIEVE A LIEUTENANT RANK) OF THE DEPARTMENT OF
11 CORRECTIONS AND REHABILITATION WHO, AT ALL TIMES
12 MENTIONED IN THIS COMPLAINT HELD THE POSITION OF
13 CORRECTIONAL OFFICER AND ASSIGNED TO CALIFORNIA STATE
14 PRISON SACRAMENTO.

15

16 (20.) DEFENDANT ALEX  IS A REGISTERED NURSE WHO WAS
17 EMPLOYED AT CALIFORNIA STATE PRISON SACRAMENTO AS A
18 REGISTERED NURSE AT ALL TIMES MENTIONED IN THIS COM-
19 PLAINT BY THE DEPARTMENT OF CORRECTIONS AND REHABILITATION,
20 AND WAS ASSIGNED BY CALIFORNIA STATE PRISON SACRAMENTO.

21

22 IV  FACTS
23 (21.) AFTER WITNESSING AN INMATE (PAUL THOMAS) BEING
24 BADLY ASSAULTED BY OFFICER'S IN JULY 2021, I WAS CONTACTED
25 BY COLEMAN V. NEWSOME CLASS ACTION ATTORNEYS LAW FIRM
26 ROSEN, BIEN, GALVAN & GRUNFELD CONCERNING THE
27 UNNECESSARY EXCESSIVE USE OF FORCE AGAINST INMATE THOMAS.
28 AFTER SPEAKING TO ATTORNEY'S ON SEPTEMBER 9, 2021 I BEGAN

1 GETTING HARASSED BY OFFICER KURGAN, WHO WORKED IN THE
2 BUILDING I WAS HOUSED AS A REGULAR OFFICER (5) DAY'S A
3 WEEK IN GUN CONTROL. AFTER SIGNING A SWORN DECLARATION
4 FOR ATTORNEY'S REGARDING THE ASSAULT ON INMATE THOMAS
5 ON NOVEMBER 9, 2021 I BEGAN SUFFERING RETAILIATION BY
6 NUMEROUS OFFICERS THAT EVENTUALLY LEAD TO FALSE ALLEGAT-
7 IONS AND DISCRIMINATORY RULE VIOLATION REPORTS AND A
8 CONCERTED EFFORT BY OFFICER'S TO HAVE ME ATTACKED, HURT,
9 OR POSSIBLY KILLED BY TELLING INMATES THAT I WAS A
10 CHILD MOLESTER, RAPIST, AND SEX OFFENDER, ETC. WHICH
11 CULMINATED IN ME BEING ATTACKED ON MAY 5, 2022 BY AN
12 INMATE JETTON # F-64512 WHO OFFICER'S TOLD I WAS
13 A SEX OFFENDER AND FALSE ALLEGATIONS OF BEING A
14 RAPIST AND CHILD MOLESTER AND THAT I WAS 'JACKING
15 OFF' TO A FEMALE OFFICER (OFFICER GAYLEN). THESE FALSE
16 ALLEGATIONS LEAD TO INMATE JETTON TO ASSAULT ME AND
17 CAUSE SERIOUS BODILY INJURY TOO MYSELF FOR WHICH HE
18 WAS NEVER CHARGED FOR AND OFFICERS TRIED TO COVER-UP
19 BY IMEDIATELY DENYING ME MEDICAL ATTENTION AND FALSIFY-
20 ING REPORTS OF MY INJURIES, NOT MENTIONING I HAD
21 A LACERATION TO MY UPPER LIP THAT NEEDED SUTURES/STITCHES
22 OR MY ASTHMA COMPLICATIONS, BUT INSTEAD LEFT ME
23 LOCKED IN A CAGE HANDCUFFED FOR (11) HOURS AND (50) MINUTES
24 ILLEGALLY. (PLEASE SEE EXHIBITS (A) AND (B.) ).
25
26 (22.) EACH DEFENDANT IS SUED INDIVIDUALLY AND IN HIS OR
27 HER OFFICIAL CAPACITY. AT ALL TIMES MENTIONED IN THIS
28 COMPLAINT EACH DEFENDANT ACTED UNDER COLOR OF STATE LAW.

1  (23.) ON SEPTEMBER 2021 AFTER SPEAKING TO ATTORNEY'S
2  FROM ROSEN, BIEN, GALVAN & GRUNFELD, LLP CO. KURGAN
3  VIOLATED MY FIRST AMENDMENT RIGHT BY RETALIATING
4  AGAINST ME AFTER SPEAKING TO ATTORNEY'S REGARDING
5  OFFICER'S ASSAULTING AN INMATE. HE BEGAN CALLING ME
6  A 'SNITCH'. BUT THE RETALIATION GOT WORSE AND CONTINUOUS
7  AFTER JANUARARY 28, 22, OR JAN. 29, 2022 AFTER I WAS
8  INTERVIEWED ABOUT A COMPLAINT I FILED ON OTHER OFFICER'S.
9  (PLEASE SEE EXHIBITS (A) & (C) ). C.O. KURGAN
10
11  (24.) ON JANURARY 9, 2022 C.O. (CORRECTIONAL OFFICER)
12  GAYLEN VIOLATED MY FIRST AMENDMENT RIGHT BY PARTICIPATING
13  IN A CAMPAIGN OF RETAILIATION BY OFFICERS, FOR PLANTIFF
14  SIGNING A DECLARATION REGARDING OFFICER'S ASSAULTING AN
15  INMATE, BY FALSELY ACUSSING PLANTIFF OF MASTURBATING
16  IN PLANTIFF'S CELL AND SENDING C.O. MARTELL AND ANOTHER
17  UNKNOWN OFFICER TO HARASS PLANTIFF. C.O. GAYLEN ALSO VIOLATED
18  PLANTIFF'S FOURTH AMENDMENT RIGHT BY LATER COMING WITH
19  OTHER OFFICER'S TO SEARCH AND THRASH PLANTIFF CELL AFTER
20  I FILED A COMPLAINT REGARDING HER FALSE    ALLEGATION
21  OF MASTURBATING. (PLEASE SEE EXHIBIT (D.) ).
22
23  (25.) ON JANURARY 9, 2022 C.O. MARTELL VIOLATED PLANTIFF'S.,
24  VIOLATED PLANTIFF'S FIRST AMENDMENT RIGHT BY PARTICIPATING
25  IN A CAMPAIGN OF RETAILIATION BY OFFICER'S AGAINST PLANTIFF
26  BY FALSELY ACCUSING PLANTIFF OF 'JACKING OFF' TO C.O. GAYLEN.
27  C.O. MARTELL ALSO VIOLATED PLANTIFF'S EIGHT AMENDMENT RIGHT
28  BY SPREAD FALSE AND INFLAMMATORY INFORMATION TO INMATE

1  JETTON # F-64512 ABOUT PLANTIFF WHICH LEAD PLANTIFF TO

2  BE ASSAULTED BY INMATE JETTON LATER. (PLEASE SEE

3  EXHIBIT (E.) ).

4

5  (26.) ON APRIL 20, 2022 C.O. M. DIAZ VIOLATED PLANTIFF'S

6  FIRST AMENDMENT RIGHT BY PARTICIPATING IN A CAMPAIGN

7  OF HARASSMENT BY OFFICER'S AGAINST PLANTIFF BY FALSELY

8  ACCUSING PLANTIFF OF SEXUAL MISCONDUCT. C.O. M. DIAZ

9  ALSO VIOLATED PLANTIFF'S EIGHT AMENDMENT RIGHT BY

10  TELLING INMATE JETTON (INMATE NUMBER F-64512) THAT...

11  "SOMEBODY NEED FUCK THAT SNITCH UP", REFERRING TOO ME,

12  WHICH HE EVENTUALLY DID ON MAY 5, 2022. (PLEASE SEE

13  EXHIBIT (E.) ).

14

15  (27.) ON JANUARY 14, 2022 C.O. NGYUEN VIOLATED PLANTIFF'S

16  FIRST AMENDMENT RIGHT BY PARTICIPATING IN A CAMPAIGN OF

17  HARASSMENT BY OFFICER'S AGAINST PLANTIFF, AND VIOLATED

18  PLANTIFF'S  FOURTH AMENDMENT RIGHT BY SEARCHING

19  HIS CELL AND DESTROYING AND STEALING PROPERTY IN

20  RETAILIATION. (PLEASE SEE EXHIBIT (A), AND (D) ).

21

22  (28.) ON JANUARY 14, 2022 LIEUTENANT ABARCA VIOLATED

23  PLANTIFF'S FIRST AND FOURTH AMENDMENT RIGHTS BY PARTICI-

24  PATING IN A CAMPAIGN OF HARASSMENT AGAINST PLANTIFF

25  AND ILLEGALLY SEARCHING HIS CELL AND DESTROYING AND

26  STEALING PLANTIFF'S PROPERTY IN RETAILIATION. (PLEASE

27  SEE EXHIBITS (A), AND (D) ).

28

1  (29.) ON JANUARY 14, 2022 SERGEANT AGUILAR VIOLATED
2  PLANTIFF'S FIRST AND FOURTH AMENDMENT RIGHTS BY PARTICI-
3  PATING IN A CAMPAIGN OF RETALIATION BY OFFICER'S AGAINST
4  PLANTIFF AND ILLEGALLY SEARCHING HIS CELL AND DESTROYING
5  AND STEALING PLANTIFF'S PROPERTY FOR FILING COMPLAINTS.
6  (PLEASE SEE EXHIBIT'S (A), AND (D)).
7
8  (30) ON JANUARY 14, 2022 SERGEANT URIBE VIOLATED PLAN-
9  TIFF'S FIRST AND FOURTH AMENDMENT RIGHTS BY PARTICI-
10 PATING IN A CAMPAIGN OF RETALIATION BY OFFICER'S AGAINST
11 PLANTIFF AND ILLEGALLY SEARCHING HIS CELL AND DESTROYING
12 AND STEALING PLANTIFF'S PROPERTY FOR FILING COMPLAINTS.
13 (PLEASE SEE EXHIBIT'S (A.) AND (D)).
14
15 (31.) ON MAY 5, 2022 C.O. GUERRA VIOLATED PLANTIFF'S
16 EIGHT AMENDMENT RIGHT BY USING UNNECESSARY
17 EXCESSIVE USE OF FORCE AFTER PLANTIFF WAS ASSAULTED
18 BY INMATE JETTON. C.O. GUERRA SPRAYED PLANTIFF WITH
19 O.C. SPRAY AFTER HE WAS BOMBED BY NUMEROUS OTHER
20 CHEMICAL AGENTS. (PLEASE SEE EXHIBIT (E)).
21
22 (32.) ON MAY 5, 2022 C.O. TAPIA VIOLATED PLANTIFF'S EIGHT
23 AMENDMENT RIGHT BY USING UNNECESSARY FORCE THAT
24 WAS EXCESSIVE BY DEPLOYING NUMEROUS BLAST GRENADES
25 AT PLANTIFF AFTER HE WAS ASSAULTED BY INMATE AND
26 WAS DEFENDING HIMSELF. THE AMOUNT OF FORCE THAT WAS
27 USED WAS EXCESSIVE FOR A MUTAL COMBAT FIGHT WITH NO
28 WEAPONS. (PLEASE SEE EXHIBIT (E)).

1  (33.) ON MAY 5, 2022 C.O. MARTIN VIOLATED PLANTIFF'S
2  EIGHT AMENDMENT BY USING UNNECESSARY EXCESSIVE
3  FORCE BY USING EXCESSIVE OC SPRAY ON PLANTIFF AND
4  DEPLOYING NUMEROUS BLAST GRENADES AT PLANTIFF.
5     (PLEASE SEE EXHIBIT (E))
6
7  (34) ON MAY 5, 2022 C.O. SHULTZ VIOLATED PLANTIFF'S
8  EIGHT AMENDMENT RIGHT BY USING UNNECESSARY
9  EXCESSIVE FORCE BY DEPLOYING NUMEROUS BLAST GRENADES
10 AT PLANTIFF   (PLEASE SEE EXHIBIT (E)).
11
12 (35.) ON MAY 5, 2022 LIEUTENANT STIEGELMEYER VIOLATED
13 PLANTIFF'S EIGHT AMENDMENT RIGHT BY LOCKING PLANTIFF
14 IN HOLDING CAGE FOR (11) HOURS AND (50) MINUTES WITHOUT
15 PROBABLE CAUSE AND FOR NO PENELOGICAL REASON OTHER THAN
16 RETAILIATION FOR PLANTIFF FILING COMPLAINTS AGAINST
17 OFFICERS. LIEUTENANT STIGELMEYER ALSO VIOLATED PLANTIFF'S
18 EIGHT AMENDMENT RIGHT BY DENYING PLANTIFF MEDICAL ATTENT-
19 ION WHILE LOCKED IN THE HOLDING CELL FOR OVER (11) HOURS.
20     (PLEASE SEE EXHIBIT (A) AND (F)).
21
22 (36.) ON MAY 5, 2022 C.O.  JOSEPH VIOLATED PLANTIFF'S
23 EIGHT AMENDMENT RIGHT BY DENYING PLANTIFF MEDICAL
24 ATTENTION (DELIBERATE INDIFFERENCE) WHILE LOCKED IN HOLDING
25 CAGE OVER (11) HOURS. (PLEASE SEE EXHIBIT'S (A), AND (F)).
26
27 (37.) ON MAY 5, 2022 SERGEANT KENDALL VIOLATED PLANTIFF'S
28 EIGHT AMENDMENT RIGHT BY LOCKING ME IN HOLDING CAGE

1  OVER (11) HOURS. (PLEASE SEE EXHIBIT (A) AND (F)  ).

2

3  (38.) ON MAY 5, 2022 C.O. A. DIAZ VIOLATED PLANTIFF'S EIGHT

4  AMENDMENT RIGHT BY DENYING ME MEDICAL ATTENTION

5  (DELIBERATE INDIFFERENCE) AND USE OF RESTROOM AFTER

6  BEING LOCKED IN HOLDING CAGE OVER (11) HOURS. (PLEASE

7  SEE EXHIBIT'S (A) AND (F)  ).

8

9  (39.) ON MAY 5, 2022 REGISTERED NURSE ALEX VIOLATED

10  MY EIGHT AMENDMENT RIGHT BY FALSIFYING MEDICAL REPORT

11  AND OMITTING PLANTIFF SUFFERED A LACERATION ON UPPER

12  LIP THAT NEEDED STITCHES, BUT ~~AND~~ INSTEAD OF BEING

13  TREATED ~~IMEDIATELY~~ I WAS LOCKED IN HOLDING CAGE OVER

14  (11) HOURS WITHOUT BEING TREATED FOR LACERATION DUE

15  TOO HER OMISSION. (PLEASE SEE EXHIBIT'S (A) AND (G)).

16

17           V. EXHAUSTION OF LEGAL          REMEDIES

18  (40.) PLANTIFF AL GENE FISHER, JR., USED THE PRISONER

19  GRIEVANCE PROCEDURE AT CALIFORNIA STATE PRISON

20  SACRAMENTO TO TRY TO RESOLVE THESE PROBLEMS.

21  PLEASE SEE EXHIBIT'S (A), (C), (D), AND (E), PLANTIFF

22  PRESENTED THE FACT'S RELATING TO THIS COMPLAINT.

23

24           VI. LEGAL CLAIMS

25  (41.) PLANTIFF REALLEGE AND INCORPORATE BY REFERENCE

26  PARAGRAPH'S 1-40

27

28  (42.) THE RETAILIATION, HARASSMENT, EXCESSIVE FORCE, AND

1  DELIBERATE INDIFFERENCE TO MY MEDICAL NEEDS, ETC.
2  VIOLATED PLANTIFF'S AL GENE FISHER, JR., RIGHTS AND
3  CONSTITUTED CRUEL AND UNUSUAL PUNISHMENT UNDER
4  THE FIRST, AND EIGHT AMENDMENTS, OF THE UNITED
5  STATES CONSTITUTION.
6
7  (43.) THE PLANTIFF HAS NO PLAIN, ADEQUATE OR COMPLETE
8  REMEDY AT LAW TO REDRESS THE WRONGS DESCRIBED
9  HEREIN UNLESS THE COURTS GRANT PLANTIFF'S DEMAND
10 FOR JURY TRIAL.
11          WHEREFORE, PLAINTIFF RESPECTFULLY
12 PRAYS THAT THIS COURT ENTER JUDGEMENT GRANTING
13 PLANTIFF:
14
15 (44.) A DECLARATION THAT THE ACTS AND OMISSIONS
16 DESCRIBED HEREIN VIOLATED PLANTIFF'S RIGHTS UNDER
17 THE CONSTITUTION AND LAWS OF THE UNITED STATES
18
19 (45.) COMPENSATORY DAMAGES IN THE AMOUNT OF $500,000
20 AGAINST DEFENDANTS EITHER JOINTLY OR SEVERALLY, FOR
21 THE PHYSICAL INJURIES PLANTIFF SUFFERED
22
23 (46.) PUNITIVE DAMAGES IN THE AMOUNT OF $100,000
24 AGAINST EACH DEFENDANT.
25
26 (47.) A JURY TRIAL ON ALL ISSUES TRIABLE BY JURY.
27
28 (48.) PLANTIFF'S COSTS IN THIS SUIT.

1  (49.) A PRAYER FOR APPOINTED COUNSEL DUE TOO ISSUES

2  ARE COMPLEX AND NEED EXTENSIVE INTERVIEWS AND

3  INVESTIGATIONS TO GET TO THE TRUTH. AND DUE TOO

4  PLANTIFF IS ON PSYCHOTROPIC MEDICATION AND IS BEING

5  TREATED FOR POST TRAUMATIC STRESS DISORDER, AND

6  BI-POLAR AND IS UNABLE TO FULLY REPRESENT HIM-

7  SELF.

8

9  (50.) ANY ADDITIONAL RELIEF THIS COURT DEEMS JUST,

10  PROPER, AND EQUITABLE, CONSIDERING THROUGH THESE

11  ABUSES PLANTIFF IS SUFFERING FROM CHRONIC BACK

12  PAINS DUE TOO STANDING LOCKED IN THAT HOLDING

13  CAGE HAND CUFFED OVER (11) HOURS, I SUFFER FROM

14  SEVER PARANOIA BECAUSE THE RETAILIATION IS STILL

15  ON-GOING AND HARASSMENT, ALSO I HAVE A LIFE LONG

16  SCAR ON UPPER LIP FROM ASSAULT I SUFFERED ON MAY 5,

17  2022 AND A CHIPPED FRONT TOOTH AND PAIN IN JAW AND

18  STILL SUFFER FROM HEAD ACHES.

19                              DATED: SEPTEMBER 7, 2023

20                              RESPECTFULLY SUBMITTED

21

22       SALINAS VALLEY STATE PRISON

23       AL GENE FISHER, JR.

24       P.O. BOX 1050

25       SOLEDAD, CA 93960

26

27

28

VERIFICATION

1
2   I HAVE READ THE FOREGOING COMPLAINT AND HEREBY
3   VERIFY THAT THE MATTERS ALLEGED HEREIN ARE TRUE
4   AND CORRECT, EXCEPT AS TO MATTERS ALLEGED ON
5   INFORMATION AND BELIEF, AND, AS TO THOSE, I BELIEVE
6   TO BE TRUE. I CERTIFY UNDER PENALTY OF PREJURY
7   THE FOREGOING IS TRUE AND CORRECT.
8
9                        EXECUTED AT SALINAS VALLEY STATE
10                       PRISON AT SOLEDAD CALIF. ON:
11                       SEPTEMBER 7, 2023
12                       Al Fisher Jr.
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# EXHIBIT

EXHIBIT:_____(A)_____



**ROSEN BIEN**
**GALVAN & GRUNFELD** LLP

101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Jessica Winter
Email: jwinter@rbgg.com

October 24, 2022

VIA ELECTRONIC MAIL ONLY

> **PRIVILEGED AND**
> **CONFIDENTIAL**
> **SUBJECT TO**
> **PROTECTIVE ORDERS**





CDCR Office of Legal Affairs

Re:   *Coleman v. Newsom*:  Retaliation and Harassment of Al Gene Fisher, J42468,
      at SAC
      Our File No. 0489-3

Dear Office of Legal Affairs:

We write on behalf of *Coleman* class member Al Gene Fisher, J42468, a CCCMS
patient housed at California State Prison, Sacramento (SAC).

Mr. Fisher has faced a series of retaliatory incidents from SAC officers starting
immediately after September 9, 2021, when he participated in a confidential phone call
with *Coleman* class counsel. The retaliation escalated rapidly after November 24, 2021,
when counsel provided CDCR Mr. Fisher's witness declaration in *Coleman* reporting an
incident of staff using excessive force against a different class member at SAC. Since
submitting the declaration, SAC officers have issued Mr. Fisher discriminatory Rule
Violation Reports (RVRs), denied him showers, and taunted Mr. Fisher by calling him a
snitch, child molester, weirdo, and other similar terms. Custody officers have directly
threatened to assault Mr. Fisher.

[4137076 8]

**PRIVILEGED AND CONFIDENTIAL**
CDCR Office of Legal Affairs
October 24, 2022
Page 2

Mr. Fisher was assaulted in May 2022. After the assault, custody officers placed Mr. Fisher in a holding cage for approximately 11 hours, without reasonable justification notwithstanding his repeated requests for medical help and medical staff's attempts to evaluate and treat his injuries.

We have identified several witnesses to the misconduct Mr. Fisher experienced. But due to these witnesses' fear of retaliation by SAC custody staff, we do not identify them or discuss any specific information from those witnesses in this letter. We have flagged herein where we have received corroborating witness testimony.

The hostile environment SAC officers have created for Mr. Fisher has impacted his mental health. He is living in a state of constant fear and anxiety, which has prevented him from receiving the mental health treatment he needs. He also asked to be moved to the CCCMS level of care, notwithstanding his need for additional mental health treatment, to allow him to escape the hostility of the officers in the EOP unit where he previously lived. He should not have been forced to make this choice. Predictably, Mr. Fisher quickly decompensated in the CCCMS setting, and recently was referred to a crisis bed. In any event, he found no relief from the harassment by moving out of the EOP unit. If anything it has gotten worse.

CDCR must investigate all officers responsible for creating this hostile environment, as described below. More immediately, we request that CDCR transfer Mr. Fisher to an EOP program outside of SAC so that he may receive mental health treatment and stop living in constant fear.

## I.   Mr. Fisher Has Experienced Targeted and Systematic Retaliation Since Submitting a Declaration Describing How He Witnessed Staff Use Excessive Force Against Another SAC Resident.

Mr. Fisher's witness declaration in *Coleman* involved an incident of staff using force against *Coleman* class member          , at SAC on Facility B, Building 1. Mr. Fisher and        both arrived at SAC on June 28, 2021 and were housed in B-1, two cells away from each other. On July 18, 2021, Mr. Fisher and         began a hunger strike because they were not receiving programming. That evening, about 8 correctional officers went to        cell and ordered      to "cuff up" so they could search his cell.        and the officers began to argue. Mr. Fisher saw that       eventually complied and was cuffed. Once cuffed, Sergeant    and CO    pulled      out of the cell and threw him onto the floor where many officers hit and kicked him. Following the incident, Mr. Fisher experienced retaliation for participating in an interview regarding what he witnessed.

**PRIVILEGED AND CONFIDENTIAL**
CDCR Office of Legal Affairs
October 24, 2022
Page 3

> A. **Officers Intentionally Spread Misinformation About Mr. Fisher's
> Alleged IEX Behavior and Targeted Mr. Fisher for Seeking
> Administrative Relief Related to that Misconduct.**

Officers' campaign of retaliation against Mr. Fisher began even before Plaintiffs'
counsel shared his declaration with CDCR. In September 2021, after Mr. Fisher spoke
with Plaintiffs' counsel regarding the July 18, 2021 incident with ▮▮▮▮▮, CO
▮▮▮▮ made a derogatory comment about his communication with Plaintiffs' counsel
and denied him the use of the phone, and access to showers and mental health groups.
Then after we shared the declaration on November 24, 2021, the retaliation escalated. At
this point he was housed at SAC on Facility A, Building 6. Since the end of 2021,
officers' retaliatory behavior against Mr. Fisher has included falsely accusing Mr. Fisher
of sexual misconduct and spreading false and inciting information about Mr. Fisher to the
incarcerated population.

On January 9, 2022, while Mr. Fisher was housed in A-6, CO ▮▮▮▮ publicly and
verbally harassed Mr. Fisher regarding alleged IEX behavior that did not occur.

During 9:00 pm count, CO ▮▮▮▮ approached Mr. Fisher's cell, 122, on the lower
tier and asked him, "What the fuck you doing weirdo?" When Mr. Fisher asked what he
meant, CO ▮▮▮▮ turned and walked down the tier, loudly accusing Mr. Fisher of being
a sex offender. As CO ▮▮▮▮ conducted count on the top tier, Mr. Fisher heard CO
▮▮▮▮ telling an incarcerated person "We got a weirdo downstairs in 122. I think he
need to get done like that dude in 7-Block." CO ▮▮▮▮ was referring to an incarcerated
person convicted of a sex offense who was killed in SAC's A-7 housing unit just one day
earlier.[1]

Through the crack in his door, Mr. Fisher then saw CO ▮▮▮▮ stop in front of
another person's cell door. Mr. Fisher heard CO ▮▮▮▮ state, "Watch out for that
weirdo in cell 122. He's fucking jacking off to Ms. G." CO ▮▮▮▮ was referring to CO
▮▮▮▮, who worked in the tower that day. Despite an officer loudly alleging that
Mr. Fisher was engaging in sexual misconduct, Mr. Fisher never received an RVR for the
purported behavior. CO ▮▮▮▮'s IEX allegation was false and merely an attempt to
incite other incarcerated people against Mr. Fisher.

Within the next few days, Mr. Fisher received an anonymous note slipped under
his cell door that stated CO ▮▮▮▮ and CO ▮▮▮▮ were telling other incarcerated

---

[1] *See* https://www.cdcr.ca.gov/news/2022/01/10/california-state-prison-sacramento-
officials-launch-investigation-into-the-death-of-an-incarcerated-person-as-a-homicide/.

**PRIVILEGED AND CONFIDENTIAL**
CDCR Office of Legal Affairs
October 24, 2022
Page 4

people that Mr. Fisher is a sex offender and that he "needs to go." Mr. Fisher completed a 602-1 regarding the January 9, 2022 incident and attached the note as evidence. At the time, Mr. Fisher's unit was on quarantine, so he could not put the grievance in the locked box in the rotunda. Instead, he handed it directly to an officer collecting mail. To this day, Mr. Fisher has not received a grievance log number or any acknowledgment that the institution received this complaint. The anonymous note disappeared with the complaint.

On January 11, 2022, while CO     conducted 4:00 pm count, Mr. Fisher told CO     that he heard what CO     had said on January 9. CO     then yelled, "I'll tell the whole tier you be in there jacking off to all the females, you fucking weirdo." CO     then continued conducting count. We have received corroborating reports regarding this incident, but the individuals are so afraid of retaliation by custody staff they that have not allowed us to use their names in this advocacy.

On January 14, 2022, multiple correctional officers searched Mr. Fisher's cell and harassed him while taking and destroying some of his personal property. Among the officers present were CO     , CO     , Lieutenant     , Sergeant     , and Sergeant   . The officers stated the search was random. During the search, Mr. Fisher stood on the tier in front of his cell. CO     also stood on the tier, and in front of Lieutenant     and Sergeants     and     stated something to the effect of, "If you want to play the game, we will play the game. This is what snitches get." Mr. Fisher reports that the lieutenant, two sergeants, and CO     heard, but did not respond to CO     's threat.

During the search, officers tore photographs of Mr. Fisher's family and his father's obituary off of his cell wall and left them on the floor. Officers also tossed his toiletries and open food on the ground so his pictures and papers were ruined by shampoo, lotion, and food. The officers also confiscated Mr. Fisher's headphones.

To address custody officers' ongoing harassment and retaliation, Mr. Fisher filed a second grievance on January 27, 2022. *See* **Exhibit A**, January 27, 2022 602-1 Log # 216866. After filing the 602, officers doubled down on their harassing behavior.

On or around January 29, 2022, ISU interviewed Mr. Fisher regarding his January 27th 602. When he returned to A-6 after the interview, Mr. Fisher heard CO     in the control booth say, "fucking snitch," as he entered the building.

Around this time, Mr. Fisher reports that CO     again began denying him showers and phone calls. When CO     worked in the control booth during second watch, Mr. Fisher often was not released from his cell for phone calls or showers.

**PRIVILEGED AND CONFIDENTIAL**
CDCR Office of Legal Affairs
October 24, 2022
Page 5

Mr. Fisher was denied these privileges two to three times per week. We have corroborating reports regarding this misconduct, including that Mr. Fisher could be heard kicking his cell door and yelling to be released for showers, but was repeatedly denied. Out of concern that they could be subject to retaliation, we do not identify witnesses here.

Mr. Fisher's attempt to address staff misconduct also led to threats of physical violence by CO██████. On February 25, 2022 around 12:30pm, Mr. Fisher was released for his phone time. Mr. Fisher approached CO██████ in the control booth and asked about his missing phone and shower time. Mr. Fisher reports that CO██████ responded in a derogatory and offensive fashion. Mr. Fisher became frustrated and argued back. Then, CO██████ said that if Mr. Fisher kept complaining, he would beat Mr. Fisher up and charge him with battery, like he had with another incarcerated person. We have corroborating reports regarding this misconduct, but do not include witness names here due to their fear of retaliation.

To address CO██████'s harassment, Mr. Fisher filed a third grievance on February 25, 2022. *See* **Exhibit B**, February 25, 2022 602-A Log # 228391

During this time, Mr. Fisher repeatedly reported to his clinician that he was being targeted by a specific custody officer. On March 28, 2022, Mr. Fisher reported "feeling 'angry' and upset with a current custody officer in his block. [Mr. Fisher] identified feeling tired of being targeted by this officer," and adamantly requested to speak with the Program Supervisor about his options to stop the harassment, such as moving housing. *See* **Exhibit C**, March 28, 2022 MHPC Progress Note. On April 8, 2022, Mr. Fisher again reported to his clinician feeling "targeted by a particular block officer" and requested to speak with the Program Supervisor. *See* **Exhibit D**, April 8, 2020 MHPC Progress Note.

Around this time, Mr. Fisher's mental health began to decline. He reports that he often declined dayroom so he could avoid interacting with custody officers. He struggled to sleep and eat, and experienced paranoia and hypervigilance. He experienced these mental health symptoms due to the unrelenting harassment by SAC officers.

## B.   Officers at SAC Continued to Harass Mr. Fisher and on April 20, 2022 Issued Him a False and Retaliatory RVR.

As a result of Mr. Fisher's first attempt to address staff harassment and retaliation through the administrative remedy process, SAC custody staff continued to harass Mr. Fisher and issued him a false RVR.

**PRIVILEGED AND CONFIDENTIAL**
CDCR Office of Legal Affairs
October 24, 2022
Page 6

On April 20, 2022, CO ██ accused Mr. Fisher of IEX and issued him an RVR. Mr. Fisher was standing at his cell door waiting for pill call when an officer came to his door and instructed him to cuff up because CO ██ had seen him "stroking his penis." *See* **Exhibit E,** May 9, 2022 602 Log # 255170. As Mr. Fisher explained to a sergeant at the time, CO ██ could not have and did not observe Mr. Fisher exposing himself. CO ██ agreed, reporting that Mr. Fisher's "[cell] door [was] blocking his lower body area." *See* **Exhibit F,** RVR Log # 7176935.

Mr. Fisher was charged with "Sexual Disorderly Conduct" pursuant to 15 C.C.R. § 3007. Section 3007 states, in full: "Inmates may not participate in illegal sexual acts. Inmates are specifically excluded in laws which remove legal restraints from acts between consenting adults. Inmates must avoid deliberately placing themselves in situations and behaving in a manner which is designed to encourage illegal sexual acts." It is not at all clear that CO ██ 's report is on its face sufficient to sustain the RVR charge. As of the date of this letter, however, we have not received the final RVR, which we understand was subject to further review. **We request and expect that the RVR report will be considered carefully to determine whether it is sufficient to support the charges against Mr. Fisher.**

Instead of being placed in segregation, Mr. Fisher was returned to A-6. There, Mr. Fisher asked CO ██ why she issued the false RVR. CO ██ responded in a retaliatory fashion, referring to Mr. Fisher's 602 submitted January 27, 2022 in response to CO ██ falsely accusing him of IEX and CO ██ 's harassment on January 9, 2022. Mr. Fisher received a copy of the RVR write-up about two weeks later.

We understand that this RVR was not heard until on or about September 12, 2022, despite CDCR regulations requiring hearings to occur within 30 days of an RVR being served, unless certain specific exceptions apply. *See* 15 C.C.R. § 3320(b). The report underlying the purported IEX incident and the unusual delay in the RVR hearing—which finally occurred immediately before Mr. Fisher went before the Board of Parole Hearings and five months after the alleged conduct—suggest that this RVR is false. Mr. Fisher challenged this series of incidents in a 602-1 that he submitted on May 9, 2022. Ex. E.

### C.    On May 5, 2022, SAC Officers Denied Mr. Fisher Medical Care for 11 Hours Following an Assault.

On May 5, 2022, at about 12:48 pm, Mr. Fisher was assaulted. At about 1:30 pm, a nurse conducted Mr. Fisher's 7219 evaluation to assess his injuries. *See* **Exhibit G,** May 5, 2022 7219. The nurse documented that Mr. Fisher had an abrasion/scratch above his right eyebrow, scratches on his elbows, and dried blood above his right lip area.

**PRIVILEGED AND CONFIDENTIAL**
CDCR Office of Legal Affairs
October 24, 2022
Page 7

Mr. Fisher was held for approximately 11 hours without justification. *See* **Exhibit H**, Holding Cell Log for Holding Cage # 3 on May 05, 2022. During his 11 hours in the holding cage, Mr. Fisher was denied medical care.

Below is a time line of the events while Mr. Fisher was in the holding cell:



Mr. Fisher's medical records show he required medical care immediately after the assault. In a 2:29 pm medical note, medical staff reported that Mr. Fisher "needs further assessment [sic] and observation in TTA for further medical monitoring patient," and recommended that he be sent "to TTA for further assessment." *See* **Exhibit I**, May 5, 2022 2:29 pm Outpatient Progress Note. Medical staff contacted A Facility custody staff three more times—at 2:42 pm, 3:53 pm, and 5:02 pm—to request that Mr. Fisher be transported to the TTA. *See* **Exhibit J**, May 5, 2022 5:24 pm Progress Note. Not until around 5:00 pm did custody respond, reporting falsely that Mr. Fisher refused medical treatment and a "refusal form [was] completed." *Id.* While in the holding cell, Mr. Fisher never refused treatment, nor did staff discuss the refusal form with him. The May 5, 2022 Refusal Form available on EHRS is not signed by Mr. Fisher. Instead, staff wrote "patient refuses to sign." *See* **Exhibit K**, May 5, 2022 Refusal Form.

The documentation regarding Mr. Fisher's ASU placement is also inconsistent and highly suspicious. In the Incident Report Package, Lieutenant ████████████ noted

**PRIVILEGED AND CONFIDENTIAL**
CDCR Office of Legal Affairs
October 24, 2022
Page 8

that Mr. Fisher suffered a head injury and had blood around his nose, an abrasion on his eyebrow, injuries to his elbows, and jaw pain after the assault. *See* **Exhibit L**, Incident Report Package Log #38394 Supplemental Report at 18, 20, 21. Yet Mr. Fisher remained in a holding cell for 11 hours due, according to Lt. ▮▮▮▮, to staff waiting for documentation to place Mr. Fisher in ASU. *Id.* at 21. Lieutenant ▮▮▮▮ further stated that Mr. Fisher did not pass the Ad-Seg placement assessment, so they had to call an offsite psychologist to clear Mr. Fisher. *Id.*

Lt. ▮▮▮▮'s explanation of "waiting on all appropriate documentation" for ASU placement is inconsistent with the copy of ASU Placement Notice that Mr. Fisher received the following day. *Id.* The Notice—signed by Lt. ▮▮▮▮—states it was served on Mr. Fisher at 4:00 pm on May 5, 2022. *See* **Exhibit M**, May 5, 2022 ASU Placement Notice. The holding cell log for Mr. Fisher also appears to state that Mr. Fisher was cleared for ASU housing as of 5:00pm. *See* Ex. H at 2 (scrawled notation of AOD approval). Lt. ▮▮▮▮'s explanation also fails to address why Mr. Fisher was retained in a holding cell for 11 hours pending placement in ASU.

Further, Mr. Fisher did not undergo the ASU Preplacement Assessment until 10:36 pm,[2] approximately 10 hours after the assault. *See* **Exhibit N**, May 5, 2022 ASU Preplacement Assessment. Lt. ▮▮▮▮'s explanation for holding Mr. Fisher in the cage for 11 hours because he did not pass the Ad-Seg placement is inconsistent with the fact that the assessment appears to have occurred at 10:36 pm; 10 hours had already passed when the ASU assessment occurred.

As Lt. ▮▮▮▮ also acknowledged, Mr. Fisher's placement in a holding cell for more than 4 hours was contrary to policy. SAC's "LOP 6 states: 'Every attempt shall be made to not retain an inmate in a holding cell longer than **four** hours.'" Ex. L at 21 (emphasis added). Title 15 requires initial approval of the facility manager or health care staff to place people in holding cells, and "continued retention [in such cells] shall be reviewed a minimum of every four hours." 15 Cal. Code Regs. § 1055. There is no indication that Mr. Fisher's placement in a holding cell was reviewed as required.

When Mr. Fisher was finally evaluated by a psychologist due to failing the ASU Pre-placement assessment, he reported that he continually asked to be seen for his injuries but was never seen. *See* **Exhibit O,** May 6, 2022 Suicide and Self-Harm Evaluation. He further reported "'harassment' by un-named officers on his housing unit - A6 - and that he had been trying to cope with this with his assigned PC, Ms. ▮▮▮▮ ....'"

---

[2] EHRS contains two ASU Pre-Placement Assessments marked "In Error" between 10:15 pm and the final 10:36 pm Assessment.

**PRIVILEGED AND CONFIDENTIAL**
CDCR Office of Legal Affairs
October 24, 2022
Page 9

*Id.* The assessing clinician documented that Mr. Fisher thought his jaw might be broken, and his "noticeable scrapes, wounds, swollen eye and 'busted' lip." *Id.* at 1. Mr. Fisher also told medical staff, "I feel like I might die if I go to sleep and no one will know. I don't want to die, I want to be seen by a doctor." *Id.* The assessing clinician asked that Mr. Fisher "be transferred to TTA for a medical evaluation of injuries." *Id.*

Lt. ████████'s explanation of waiting on paperwork does not explain why Mr. Fisher was not sent for medical treatment, while any ASU paperwork was being prepared. Custody staff on the scene of the assault identified multiple injuries to Mr. Fisher, including specifically that he had suffered a head injury. Medical staff repeatedly asked that Mr. Fisher be sent to the TTA for treatment, and each staff member who observed him noted his obvious injuries. Mr. Fisher also reported symptoms consistent with a head injury—dizziness, blurry vision, and vomiting. Finally, at 12:06 am on May 6, 2022, Mr. Fisher arrived at the TTA. *See* **Exhibit P**, May 6, 2022 2:03 am Progress Note. There, he reported blurry vision in both eyes and feeling woozy, as well as jaw pain and that he could not open his mouth fully or "pivot his jaw." *Id.* Nursing staff documented that his jaw was swollen, that he had a contusion and abrasion above his right eyebrow, and multiple abrasions to his hands, elbows, and knees. *Id.* Medical staff cleaned Mr. Fisher's lip laceration. *Id.* At 1:27 am, medical staff notified the on-call provider, who ordered that Mr. Fisher be sent to UC Davis for a head injury. *Id.* While there, doctors sutured the laceration above his lip. *See* **Exhibit Q**, Outside Hospital Records at 2.

Mr. Fisher returned to the prison the following day and was admitted to the MHCB. Mr. Fisher was in the MHCB from May 6 to 16, 2022. During his time in the MHCB, Mr. Fisher repeatedly reported officers' retaliatory behavior. *See* **Exhibit R**, May 7, 2022 SRASHE at 2; and **Exhibit S**, May 9, 2022 MHPC Inpatient Progress Note.

On May 9, Mr. Fisher submitted 602-1 Log # 255170 describing in detail the April 2022 incidents involved CO ███, and the aftermath of the May 5 assault. *See* Ex. E.

Despite reporting that he would not feel safe on B-Yard because of his history of witnessing staff misconduct there and completing a declaration about the same, SAC rehoused Mr. Fisher on B-Yard following his discharge from MHCB.

**PRIVILEGED AND CONFIDENTIAL**
CDCR Office of Legal Affairs
October 24, 2022
Page 10

## II.    SAC Staff Interfered with Plaintiffs' Counsel's Ability to Communicate with Mr. Fisher on August 4, 2022

On August 4, 2022, Plaintiffs' counsel had a scheduled confidential legal call with Mr. Fisher at 9:30 am. That morning, Mr. Fisher asked multiple officers about his scheduled call and when he would be released for the call. He never was released.

On the same date, around 10:00 am, Plaintiffs' counsel received a call from SAC informing us that Mr. Fisher refused to take our call.

This false refusal is consistent with the pattern of false refusals that Plaintiffs' counsel, Defendants, and the Special Master team have identified as persistent staff misconduct at SAC since at least 2016. It evidences persistent interference with class members' access to counsel.[3]

## III.    Effects of Retaliatory Treatment on Mr. Fisher's Wellbeing

The culmination of retaliatory incidents has impacted Mr. Fisher's ability to function and to obtain the mental health care he needs. Because of his real fear of further retaliation, Mr. Fisher isolated and did not attend his EOP mental health treatment groups. Mr. Fisher experiences ongoing frustration with mental health staff not believing that officers actually are retaliating against him; although Mr. Fisher experiences PTSD symptoms, such as paranoia, he justifiably fears further retaliation. Mr. Fisher reports feeling that he may "just snap" due to the ongoing stress and fear. Mental health staff frequently appear to mistake Mr. Fisher's calm demeanor to signify that he is not suffering. For example, in a progress not after the May 5, 2022 assault, the provider documents Mr. Fisher's reports of retaliation and staff misconduct but that his "affect was not consistent with [his] thought content. He spoke matter-of-factly without signs of emotional distress." It seems that mental health staff may over-rely on Mr. Fisher's typically calm demeanor, and on that basis dismiss or discount his reports of distress.

Recently, Mr. Fisher asked to be and was placed at a lower level of care to escape the taunts, threats, and mistreatment by SAC officers in his EOP building. Due, however, to his need for more care than can be provided in CCCMS, Mr. Fisher quickly decompensated and has engaged in multiple instances of serious self-harm.

---

[3] *See* **Exhibit T,** October 24, 2016; December 2, 2016; April 21, 2017 versions Corrective Action Plan ("CAP") for SAC; **Exhibit U,**          May 5, 2022 letter regarding Ongoing Staff Misconduct at CSP-SAC.

**PRIVILEGED AND CONFIDENTIAL**
CDCR Office of Legal Affairs
October 24, 2022
Page 11

## IV.    Immediate Steps Needed to Prevent Further Harm

      To address Mr. Fisher's need to live in a safe environment that allows him to receive mental health care, OIA investigators should investigate the continuing course of retaliation and misconduct waged against Mr. Fisher, including, but not limited to, the following specific events:[4]

1.    September 2021,

    a.    SAC, A-6, CO ███ retaliating against Mr. Fisher for contacting us, and denying him use of the phone, access to showers, and mental health groups as punishment.

2.    January 9, 2022,

    a.    SAC, A-6, CO ███'s public verbal harassment based on false IEX charges.

    b.    SAC A-6, CO ███'s statements to other incarcerated people that Mr. Fisher "need to get done like that dude in 7-Block."

    c.    SAC A-6, CO ███ again denying showers, and phone calls as punishment for contacting *Coleman* counsel.

    d.    Failure to process Mr. Fisher's initial 602 regarding CO ███'s harassment on January 9, 2022.

    e.    Anonymous note that said CO ███ was telling other incarcerated people that Mr. Fisher is a sex offender and that he "needs to go."

3.    January 11, 2022

    a.    SAC, A-6, CO ███ loudly telling Mr. Fisher, "I'll tell the whole tier you be in there jacking off to all the females, you fucking weirdo."

---

[4] We understand that ISU conducted a cursory, 15-minute interview of Mr. Fisher related to a small portion of these events and asked him general questions about the same.

**PRIVILEGED AND CONFIDENTIAL**
CDCR Office of Legal Affairs
October 24, 2022
Page 12

4.    January 14, 2022,

    a.    SAC A-6, multiple correctional officers "randomly" searching Mr. Fisher's cell and harassing him while taking and destroying his personal property.

    b.    During the cell search, CO ███ telling Mr. Fisher, "This is what snitches get" in front of a lieutenant, two sergeants, and an officer.

5.    February 25, 2022,

    a.    CO ███ telling Mr. Fisher that if he kept complaining, he would beat Mr. Fisher up and charge him with battery, like he had to another incarcerated person.

6.    April 20, 2022,

    a.    CO ███ issuing Mr. Fisher a false RVR as punishment for filing 602s.

7.    May 5, 2022,

    a.    Facility A staff holding Mr. Fisher in a holding cell for 11 hours without justification and denying him access to medical care despite their knowledge that he had suffered a head injury, among other obvious injuries.

8.    August 4, 2022,

    a.    SAC staff falsely reporting that Mr. Fisher refused a confidential legal call with Plaintiffs' counsel, interfering with Plaintiffs' ability to communicate with our client.

       **Please provide SAC's LOP 6, cited by Lieutenant ███ in the incident report package for the May 5 assault on Mr. Fisher. Please also provide the results of the April 20, 2022 RVR once final review is complete.**

/ / /

/ / /

/ / /

/ / /

[4137076 8]

**PRIVILEGED AND CONFIDENTIAL**
CDCR Office of Legal Affairs
October 24, 2022
Page 13


Please confirm that OIA will be investigating these allegations and produce all associated documentation following the close of the investigation.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Jessica Winter*

By:   Jessica Winter

JW:id:etb
Exhibits A-U

cc: *Coleman* Special Master Team
    *Coleman* Co-Counsel
    *Armstrong* Co-Counsel



# EXHIBIT

EXHIBIT:_____(B)_____

1 **DECLARATION OF AL GENE FISHER**

2 I, Al Gene Fisher, declare:

3 1.    I have personal knowledge of the matters set forth herein, and if called as a
4 witness, I could and would competently so testify.

5 2.    My California Department of Corrections and Rehabilitation ("CDCR")
6 number is J42468. I am currently housed at California State Prison – Sacramento ("SAC")
7 on Facility A in Building 6. I am 52 years old.

8 3.    I am a *Coleman* class member. I am at the Enhanced Outpatient Program
9 ("EOP") level of care. I am diagnosed with Major Depressive Disorder, Bipolar Disorder,
10 and PTSD. As a result of my depression, there are days when I cannot function. On really
11 bad days, I don't want to get out of bed, eat, exercise, or go about my day to day life. I
12 have PTSD because correctional officers assaulted me while I was in handcuffs in 2019
13 when I was housed at California State Prison - Corcoran. As a result of my PTSD, I
14 frequently have anxiety attacks. Sometimes when officers put handcuffs on me I simply
15 collapse with fear and anxiety.

16 4.    I have chronic back pain and arthritis in my shoulder. I have stenosis in my
17 back. I regularly have back spasms. I have a cuffing restriction, which means that I can be
18 cuffed only in waist chains and not cuffed behind my back. I used to have a lower bunk
19 and a lower tier chrono and a mobility impaired disability vest. However, once I filed a
20 lawsuit against officers at High Desert State Prison they took away all of my housing
21 restrictions. I have not requested these accommodations since then because I am afraid of
22 retaliation.

23 5.    I also have serious asthma.

24 6.    I have been housed at SAC since June 28, 2021.

25 7.    During my time at SAC, I have been housed in Facility B, Building 1, and
26 Facility A, Building 6, where I am currently housed.

27

28

[3804397 1]                                        1                          *A* Initials: F

8.      I transferred to SAC on the same day as another incarcerated person named Paul Thomas. We were placed two cells away from each other. Mr. Thomas was in cell 203 and I was in cell 205.

9.      When I first transferred to Facility B, Building 1, we were not offered any programming. Facility B, Building 1 is an orientation building, so everyone in the building was on orientation status. My understanding was that new transfers were on orientation status until they went to their committee hearing. I went to my committee hearing within a week of transferring. However, I was still on orientation status for weeks after the hearing. When I asked correctional officers why I was in the orientation building for so long, they told me that there were no beds available for me at the moment, and I had to wait for more permanent housing.

10.      On orientation status, I received no mental health groups, no yard, and no dayroom. The only mental health treatment I did receive was a weekly cell side checkup from a mental health clinician. I did not like talking to my clinician cell-side because it was not confidential. I did not feel comfortable talking about my mental health with correctional officers and other incarcerated people listening. I was let out of my cell only for showers three times per week.

11.      Everyone in the building was cell-fed, and staff brought our canteen items to our cells. After three weeks of no programming, I became agitated and upset. I was receiving ducats for mental health groups, but was not let out for them, which was very confusing to me. I overheard a clinician come up to my neighbor's cell one day and ask why he refused to go to his confidential one on one treatment session and mental health groups. I overheard my neighbor say that he did not refuse: He was simply never let out. I understood this to mean that staff were lying that my neighbor was refusing to go to treatment. I felt restless and angry.

12.      On July 18, 2021, I started a hunger strike with two incarcerated people in the cells next to me. One of them was Paul Thomas.

A. F.  Initials: A. F.

13.     That evening at approximately 5:00pm, two officers approached my cell. I did not know their names. One was a female officer and the other was male. They said that they heard that I was on a hunger strike but that they had information that I had food in my cell. They said that they wanted to search my cell for food to make sure that I wasn't lying about the hunger strike. I asked the correctional officers to show me paper work proving they were allowed to search my cell. They left my cell without searching it.

14.     About 45 minutes later, at least 7 or 8 officers came into the building. They went to my neighbor, Mr. Thomas's cell. I could see them from the crack in the side of my cell door. I heard the officers order Mr. Thomas to cuff up. I heard them say that they were going to search his cell. I overheard Mr. Thomas arguing with the officers, but I couldn't hear everything. The arguing got louder.

15.     I heard Mr. Thomas say "I don't have to come out" to which someone, whom I later identified as Sergeant Ware, replied "you're coming out one way or another."

16.     At this point I was getting scared for Mr. Thomas's safety. Mr. Thomas is a young black man. He appears to be in his mid-twenties. I screamed "quit arguing with them and come out of the cell, Thomas!" There was so much yelling going on that I don't think he could hear me.

17.     They went back and forth for a few minutes, until finally, Mr. Thomas complied. I saw him put his hands out of the door and the officers applied handcuffs to him. I saw the cell door open and saw Sergeant. Ware and another officer who I knew, Officer Avila, pull Mr. Thomas out of the cell and throw him to the ground. I could not see Mr. Thomas because there were so many officers swarming and surrounding him. They were all hitting and kicking him. Officers were reaching over each other to get a punch or a kick in. I could see Officer Avila trying to hurt Mr. Thomas the most. After about a minute all the other officers stepped away, but Officer Avila was still punching him.

18.     I overheard an officer say "he's suicidal, go get him a gown." Then, a number of the officers came over to my cell and told me to cuff up. I told them I would

1   not cuff up.  I was terrified after seeing them beat Mr. Thomas while he was in handcuffs.

2   I said that I would come out of the cell and let them search it, but I didn't want to cuff up.

3   They told the tower officer to open the cell door, and then locked me in the showers.  A

4   few minutes later when I was allowed back to my cell, I found my cell torn apart.  All of

5   my food was gone, and a few of my books and letters were gone too.

6          19.    I assume Mr. Thomas was escorted out of the building because he was gone

7   when I got back to my cell.

8          20.    Mr. Thomas filed an appeal alleging excessive use of force.  I found out

9   because he mentioned me as a witness.  A lieutenant interviewed me and I told him exactly

10  what I witnessed.  I transferred to a new building a few weeks later.  When I got my

11  property, many of my items were missing, and my TV was broken.  I believe that this was

12  retaliation for providing a witness account for Mr. Thomas.

13         21.    Mr. Thomas was sent to administrative segregation.  I see him in the

14  segregation yard cages when I go out to the yard.

15         22.    My appetite has not been normal since I witnessed officers beating Mr.

16  Thomas.  I am very paranoid and I frequently have nightmares.  I am scared of being

17  cuffed and escorted anywhere.

18

19

20         I declare under penalty of perjury under the laws of the United States of America

21  that the foregoing is true and correct, and that this declaration is executed at Represa,

22  California this _27_ day of _OCT_, 2021

23

24                                          /s/ _Al Fisher_

                                            Al Gene Fisher

25

26

27

28

[3804397 1]                         4                      A.F.  Initials: A.F.

# EXHIBIT

EXHIBIT:_____(C)_____

*P.R.E.A. COMPLAINT*

STATE OF CALIFORNIA
**GRIEVANCE**
CDCR 602-1 (03/20)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Page 1 of 2

| **STAFF USE ONLY** | Grievance #: 216860 Date Received: |
| | Date Due: |
| | Categories: |

_This is the process to ask for help with a complaint._

Claimant Name: __AL FISHER__ CDCR #: __J-42468__ Current Housing/Parole Unit: __A-6-122__

Institution/Facility/Parole Region: ____SAC____

In order for the Department to understand your complaint, make sure you have answered the following questions:

- What is the nature of your complaint?
- When and where did the complaint occur?
- Who was involved?
- Which specific people can support your complaint?
- Did you try to informally resolve the complaint?
- What rule or policy are you relying on to make your complaint?
- Are there documents that would be helpful to support your position? List the documents if you do not have them. Please note that documents submitted with this form will not be returned. I HAVE CELL SEARCH RECIEPT SIGNED BY c/o GALYEN.
- What specific action would resolve your complaint?

**CSP-SAC APPEALS**
**JAN 28 '22 AM11:25**

ON JAN. 9, 2022 A FEMALE OFFICER NAMED T. GALYEN WORKED 3RD WATCH IN A-6 IN CONTROL BOOTH. AT 4:00 COUNT TIME SHE ANNOUNCED FOR ALL INMATES TO REMOVE WINDOW COVERS FROM CELL WINDOWS. THE OFFICER WHO WORKED ON FLOOR AND DID COUNT TOLD ME SPECIFICALLY TO REMOVE MY WINDOW COVERS WHICH I HAD ON WINDOW BLOCKING THE VIEW OF MY TOILET AND SINK. AT FIRST I REFUSED STATING I NEEDED IT FOR PRIVACY SINCE A FEMALE WAS WORKING IN CONTROL BOOTH & CAN VIEW ME USING MY TOILET, ETC. AFTER THREATS OF BEING WRITE UP I REMOVED IT. FEMALE OFFICER (GAYLEN) HEARD CONVERSATION. FOR THE NEXT (5) HOURS SHE VIEWED ME USING TOILET (URINATING, WATCHING, ETC.) NUMEROUS TIMES MAKING FACIAL EXPRESSIONS. AFTER PROGRAM WAS OVER AT 9:00 P.M. AND IT WAS COUNT TIME I WAS STANDING AT MY TOILET URINATING I LOOKED UP TO SEE c/o GALYEN STARING AT ME INTENTLY WHICH MADE ME FEEL VIOLATED SO I PUT MY WINDOW COVER BACK UP AND TURNED OFF MY CELL LIGHT NOT FEARING A WRITE UP. A FEW MINUTES LATER c/o MARTELL AND THE OTHER OFFICER (NAME UNKNOWN) WHO WORKED THE FLOOR CAME TO MY CELL AND ASKED ME... "WHAT THE FUCK YOU DOING WEIRDO"! I WENT TO DOOR AND ASKED THEM... "WHAT THE FUCK YOU MEAN WHAT I'M DOING — NOTHING"! MARTELL STARTED TO WALK AWAY SAYING OVER THE TIER... "FUCKING WEIRDO, SEX OFFENDER". A FEW MINUTES LATER HE DID 9:00 COUNT ON TOP TIER AND I HEARD TELL SOMEONE UP THERE... "WE GOT A WEIRDO DOWNSTAIRS IN 122. I THINK HE NEED TO GET DONE LIKE THAT DUDE IN 7-BLOCK", REFERING TO INMATE WHO GOT KILLED IN 7-BLOCK RECENTLY. THEN HE

DISTRIBUTION    Original: Claimant's File    Copies: DAI, DAPO, and Claimant

STATE OF CALIFORNIA
**GRIEVANCE**
DEPARTMENT OF CORRECTIONS AND REHABILITATION

CDCR 602-1 (03/20)
Page 2 of 2

WENT TO INMATE JET "ROW/CELL IN #131 WHO'S HIS PORTER/WORKER AND SAID LOUD OVER THE TIER ... "WATCH OUT FOR THAT WEIRDO IN CELL-122 HE FUCKING JACKING OFF TO MS. G" - REFERING TO OFFICER IN TOWER C/O MARTELL DID THIS ALL IN AN ATTEMPT TO HAVE INMATES ASSAULT ME AS OFFICER'S DO FOR SUCH ACCUSATIONS. NEXT DAY I RECEIVED A KITE FROM SOMEONE SAYING C/O MARTELL TELLING INMATES IM A SEX OFFENDER & NEED TO GO. ON JAN. 11, 2022 AT 4:00 COUNT TIME I CONFRONTED C/O MARTELL ABOUT WHAT HE'S BEEN SAYING & THAT I HEARD HIM MYSELF SAYING THOSE THINGS OVER THE TIER AND TO INMATE JET'S ON. HE IMEDIATELY BLEW UP AND STARTING YELLING REAL LOUD ... "I'LL TELL THE WHOLE TIER YOU RE IN THERE JACKING OFF TO ALL THE FEMALES, YOU FUCKING WEIRD". AND ALOT OF OTHER THINGS WE COULDN'T UNDERSTAND, NUMEROUS INMATES HEARD THIS OUTBURST INMATE BANKS CELL 123, TM TINOCO CELL #225, JET'S ON CELL 131 AND OTHERS WHO'S AFRAID TO COME FORWARD. I WROTE AN EMERGENCY/P.R.E.A. COMPLAINT ON JAN. 12, 2022 BUT HAD TO PUT IN INSTITUTIONAL MAIL BECAUSE WE COULDN'T GO TO ROTUNDA (COVID QUARANTINE) TO PUT IN BOX SO I NEVER HEARD BACK AND I PUT THE "KITE" IN THERE TELLING ME MARTELL TOLD INMATES IM A SEX OFFENDER AND "NEED TO GO". THIS IS MY SECOND COMPLAINT. THAT VERY NEXT DAY THE HARRASSMENT STARTED ON JAN. 14, 2022 THAT SAME FEMALE OFFICER WHO WORKED IN CONTROL BOOTH THAT JAN. 9, 2022 (I'M PRETTY SURE IT WAS THE 9TH) MS. GALYEN WHO WAS NOT EVEN WORKING IN OUR BUILDING ON THIS DAY (THE 14TH) CAME INTO THIS BUILDING WITH LT. ABARCA(?) SGT. AGUILAR, SGT. URIBE, AND C/O NGUYEN AND CAME STRAIGH TO MY CELL & TOLD ME TO STEP OUT AND COMMENCED TO TEAR MY CELL UP! TORE PERSONAL PICTURES OFF WALL THAT WAS NOT PORN & THREW AWAY, TOOK MY HEADPHONES AND OTHER ITEMS & LEFT MY CELL THRASHED. THREW FOOD & COSMETICS OUT ONTO THE FLOOR, YOU CAN TELL THIS WAS INTIMIDATION & HARRASSMENT. AFTER I TOLD THEM I KNEW WHAT THIS WAS ABOUT BECAUSE WHY WOULD THE LIEUTENANT LET MS. GALYEN COME TO THIS BUILDING TO TEAR MY CELL UP AFTER SHE MADE A FALSE ALLEGATION & I COMPLAINED, AND SHE WASN'T EVEN ASSIGNED TO THIS BUILDING. THIS NIGHT (JAN. 14, 2022) LT. ABARCA TRIED TO SAY IT WAS A RANDOM SEARCH, THEN I HEARD WENT TO SEARCH OTHER CELL'S TO COVER UP MY HARRA MENT. SINCE, I BEEN GETTING HARRASSED DAILY BY THESE OFFICER'S AND VERBAL THREAT'S FROM INMATES, I WANT THIS THOUROUGHLY INVESTIGATED AND DOCUMENTED BECAUSE LAST TIME OFFICER'S DID THIS I WAS STABBED IN 2018, SO IN THE EVENT THIS HAPPEN AGAIN I WANT IT DOCUMENTED THAT I COMPLAINED & TRIED TO GET HELP THE RIGHT WAY.

**Reminder:** Please attach all documents in your possession that support your claim(s).

Please note that this form and supporting documents will not be returned to you.

Claimant Signature: _Al Fisher_          Date Signed: 1-27-22



**CALIFORNIA DEPARTMENT of**
**Corrections and Rehabilitation**

# OFFICE OF GRIEVANCES DECISION

**Offender Name:** FISHER, AL GENE Jr          **Date:** 02/08/2022
**CDC#:** J42468
**Current Location:** SAC-Facility A          **Current Area/Bed:** A 006 1 - 022001L

**Log #:** 000000216866

---

## Claim #: 001

**Received at Institution/Parole Region:** California State Prison, Sacramento
**Submitted to Facility/Parole District:** SAC-Facility A
**Housing Area/Parole Unit:**
**Category:** General Employee Performance          **Sub-Category:** Other Staff Misconduct - NOS

The California Department of Corrections and Rehabilitation received your grievance on 01/28/2022 which you submitted on 01/27/2022.

Pursuant to the California Code of Regulations, title 15, your claim has been identified as an allegation of staff misconduct, meaning it will be referred outside the grievance and appeal process to an appropriate authority within the Department for the purpose of gathering facts needed to prove or disprove the allegation. A separate response will be provided to you at the conclusion of that process. This decision exhausts all administrative remedies available to you for this claim.

**Decision: Allegation of Staff Misconduct**

---

## Claim #: 002

**Received at Institution/Parole Region:** California State Prison, Sacramento
**Submitted to Facility/Parole District:** SAC-Facility A
**Housing Area/Parole Unit:**
**Category:** General Employee Performance          **Sub-Category:** Substandard Performance

The California Department of Corrections and Rehabilitation received your grievance on 01/28/2022 which you submitted on 01/27/2022.

Pursuant to the California Code of Regulations, title 15, your claim has been identified as an allegation of staff misconduct, meaning it will be referred outside the grievance and appeal process to an appropriate authority within the Department for the purpose of gathering facts needed to prove or disprove the allegation. A separate response will be provided to you at the conclusion of that process. This decision exhausts all administrative remedies available to you for this claim.

**Decision: Allegation of Staff Misconduct**

## Claim #: 003

**Received at Institution/Parole Region:**     California State Prison, Sacramento
**Submitted to Facility/Parole District:**     SAC-Facility A
**Housing Area/Parole Unit:**
**Category:**   General Employee Performance          **Sub-Category:**   Substandard Performance

The California Department of Corrections and Rehabilitation received your grievance on 01/28/2022 which you submitted on 01/27/2022.

Pursuant to the California Code of Regulations, title 15, your claim has been identified as an allegation of staff misconduct, meaning it will be referred outside the grievance and appeal process to an appropriate authority within the Department for the purpose of gathering facts needed to prove or disprove the allegation. A separate response will be provided to you at the conclusion of that process. This decision exhausts all administrative remedies available to you for this claim.

**Decision: Allegation of Staff Misconduct**

## Cell Search Worksheet

DATE: 1/14/22    TIME: 1750    CELL #: 122

### INMATES ASSIGNED TO THIS CELL

NAME: Fisher    NUMBER: 1424468    NAME:_____    NUMBER:_____

### SEARCH CONDUCTED BY :

SUPERVISING OFFICER: T. Cullen    POSITION: C/C

CORRECTIONAL OFFICER (S ): B. Nguyen / _____    POSITION: C/O

CELL CONDITION:_____
( INDICATE IF THE CELL CONTAINED ANY OF THE FOLLOWING ITEMS
AND IF THEY WERE PROPERLY FUNCTIONING AND LOCATED )

TELEVISION: _____    SERIAL #:_____/_____    WORKING: ✔    NOT WORKING:_____
RADIO: _____    SERIAL #:_____/_____    WORKING:_____    NOT WORKING:_____
CASSETTE: _____    SERIAL #:_____/_____    WORKING:_____    NOT WORKING:_____
OTHER: _____    SERIAL #:_____/_____    WORKING:_____    NOT WORKING:_____
COMMENTS:_____

### ITEMS CONFISCATED DURING SEARCH

** NOTE: INCLUDE REASON CONFISCATED AND DISPOSITION OF ALL ITEMS

ITEM (S ): (2) STINGER, MUSHED APPLES, HOT PLATE, PORNOGRAPHIC PICS, EXCESSIVE T.P., TRASH, UNAUTHORIZED PILLOW, TWO BLANKETS ALTERERED LAUNDRY, PRUNO MATERIAL, PRUNO

REASON: CONTRABAND

LOCATION: THROUGHOUT CELL

DISPOSITION: HOT TRASHED.

WAS A RULES VIOLATION REPORT ( CDC- 115 ) ISSUED FOR CONFISCATED CONTRABAND? YES / NO

IF YES:    REPORT WRITTEN BY:_____    POSITION:_____

ISSUED TO INMATE (S)_____ /_____

SUPERVISOR:_____ POSITION:_____

** NOTE: CELL SEARCHES ARE NOT INTENDED AS PUNISHMENT. SUPERVISORY STAFF SHALL BE RESPONSIBLE FOR ENSURING ALL STAFF RESPECTS INMATES PROPERTY DURING ANY CELL SEARCH, AND DOCUMENT ALL ITEMS CONFISCATED FROM CELL AND THE REASON FOR THE CONFISCATION. A COPY OF THIS WORKSHEET WILL BE LEFT IN THE CELL WHEN THE SEARCH HAS BEEN COMPLETED.

DISTRIBUTION: **WHITE:**    Facility Office  **YELLOW:** Inmate(s)

VGA-0376 (Rev. 10/96)

# EXHIBIT

EXHIBIT:_____(D)_____

*EMERGENCY*

STATE OF CALIFORNIA
INMATE/PAROLEE APPEAL FORM ATTACHMENT
CDCR 602-A (REV. 03/12)

- DEPARTMENT OF CORRECTIONS AND REHABILITATION

Side 1

| IAB USE ONLY | Institution/Parole Region: | Log #: | Category: |
|---|---|---|---|
| | 228391 | | |
| | | FOR STAFF USE ONLY | |

Attach this form to the CDCR 602, only if more space is needed. Only one CDCR 602-A may be used.
Appeal is subject to rejection if one row of text per line is exceeded.  WRITE, PRINT, or TYPE CLEARLY in black or blue ink.

| Name (Last, First): | CDC Number: | Unit/Cell Number: | Assignment: |
|---|---|---|---|
| FISHER, AL | J-42468 | A-6-122 | N/A |

A. Continuation of CDCR 602, Section A only (Explain your issue): ON JAN. 27, 2022 I
FILED A PREA COMPLAINT ON OFFICER'S HERE ON A-6.
ON 1-28-22, OR I BELIEVE ON 1-29-22 C/O KURGAN
WHO WORK IN A-6 CONTROL BOOTH ANNOUNCED TOO ME I
HAD TO REPORT TO WATCH OFFICE WHERE I WAS INTERVIEW
ED BY I BELIEVE AN I.S.U. OFFICER (NAME UNKNOWN)
FOR MY PREA COMPLAINT. UPON RETURNING TO BUILDING
C/O KURGAN CALLED ME A SNITCH AND MADE OTHER RE-
MARK'S LETTING ME KNOW HE KNEW WHAT THAT INTER-
VIEW WAS ABOUT. SINCE THEN C/O KURGAN BEEN TELLING
ANY NON-REGULAR OFFICER WHO WORK ON HIS SHIFT IN THIS
BUILDING THAT I'M A "WEIRDO" AND SNITCH AND "FUCK
HIM HE GOT NOTHING COMING" AND TELLING INMATES
TOO I'M A SNITCH AND SEX OFFENDER AND I GOT TO GO!
HE'S DENIED ME MY SHOWER AND PHONE CALL'S WHILE ON
QUARANTINE MANY TIMES WHICH IS INHUMANE, UNSANITARY,
AND CAUSING ME MENTAL ANGUISH CAUSE I DON'T KNOW
WHAT TO DO ABOUT THIS BLATANT HARRASSMENT. I TALKED
TO SGT. GONZALES LAST WEEK AS WELL AS MY NEIGHBOR

Inmate/Parolee Signature: Al. Fisher.          Date Submitted: 2-25-22

BSP-SAC APPEALS
FEB 28 '22 M12:24
STAFF USE ONLY

B. Continuation of CDCR 602, Section B only (Action requested): _____

_____

_____

_____

_____

_____

_____

_____

_____

_____

_____

Inmate/Parolee Signature: _____          Date Submitted: _____

**D. Continuation of CDCR 602, Section D only (Dissatisfied with First Level response):** IN CELL A-6-121 F/M AYALA BECAUSE HE'S BEEN DENYING THEM OF THEIR SHOWER AND PHONE CALL'S AT TIMES JUST TO HARRASS ME AND SAYING HE DIDN'T HAVE ENOUGH TIME TO MAKE IT TO OUR CELL'S FOR SHOWER AND PHONES. HE TOLD SGT. GONZALES THAT INMATES WERE TAKING TOO MUCH TIME AS THE REASON HE WAS NOT GETTING TO US THAT "WE" NEED TO POLICE THE INMATES TO NOT TAKE TOO MUCH TIME. HE ADMITTED TO SGT GONZALES THAT HE WAS NOT DOING HIS JOB, BECAUSE IT'S NOT OUR RESPONSIBILITY TO "POLICE" INMATES NOR CAN WE, FOR US TO BE GIVEN OUR RIGHT'S, IN CLEAR VIOLATION OF TITLE 15 SECTION 3390, 3391 "EMPLOYEE CONDUCT". THIS HAS BEEN AN ON-GOING PROBLEM WITH C/O KURGAN AND NOW HE'S TARGETING ME WITH HIS HARRASSMENT DIRECTLY BECAUSE OF THIS PREA COMPLAINT I FILED AND I KNOW TRYING TO HAVE ME HURT OR KILLED. I TOLD MY CLINICIAN ABOUT IT BECAUSE I'M HAVING PROBLEM'S SLEEPING, EATING & CONCETRATING BUT SHE TOLD ME ALL I CAN DO IS NOTIFY THE "COLEMAN" ATTORNEY'S OF THE SITUATION AND WRITE A 602 WHICH I'M DOING AGAIN. AS I SAID I TRIED TO TALK TO HIS SUPERIOR ABOUT THE SITUATION SGT GONZALES TO NO AVAIL THE HARRASSMENT HAS ONLY GOTTEN WORSE! I DON'T KNOW WHAT'S GOING TO HAPPEN TOO ME ONCE WE'RE OFF QUARANTINE AND BACK TO REGULAR PROGRAM WITH OTHER INMATES, NOR WITH C/O KURGAN BECAUSE TODAY 2-25-22 HE DIRECTLY THREATHENED ME FOR THE WHOLE SECTION TO HEAR THAT IF I KEPT COMPLAINING HE'LL COME DOWN AND FUCK ME UP AND CHARGE ME FOR BATTERY!

Inmate/Parolee Signature: _Al Fisher_     Date Submitted: 2-25-22

**F. Continuation of CDCR 602, Section F only (Dissatisfied with Second Level response):** _____

Inmate/Parolee Signature: _____     Date Submitted: _____


CALIFORNIA DEPARTMENT *of*
**Corrections and Rehabilitation**

# OFFICE OF GRIEVANCES DECISION

**Offender Name:** FISHER, AL GENE Jr                    **Date:** 03/08/2022

**CDC#:** J42468

**Current Location:** SAC-Facility A                    **Current Area/Bed:** A 006 1 - 022001L

**Log #:** 000000228391

## Claim #: 001

| | |
|---|---|
| **Received at Institution/Parole Region:** | California State Prison, Sacramento |
| **Submitted to Facility/Parole District:** | SAC-Facility A |
| **Housing Area/Parole Unit:** | |

**Category:** General Employee Performance    **Sub-Category:** Substandard Performance

The California Department of Corrections and Rehabilitation received your grievance on 02/28/2022 which you submitted on 02/28/2022.

Pursuant to the California Code of Regulations, title 15, your claim has been identified as an allegation of staff misconduct, meaning it will be referred outside the grievance and appeal process to an appropriate authority within the Department for the purpose of gathering facts needed to prove or disprove the allegation. A separate response will be provided to you at the conclusion of that process. This decision exhausts all administrative remedies available to you for this claim.

**Decision: Allegation of Staff Misconduct**

# EXHIBIT

EXHIBIT:_____(E)_____

STATE OF CALIFORNIA
**GRIEVANCE**
CDCR 602-1 (03/20)

MY LIFE IS IN DANGER

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Page 1 of 2

| **STAFF USE ONLY** | Grievance #: 255170     Date Received: |
| | Date Due: |
| | Categories:     CSP-SAC APPEALS |
| | MAY 11 '22 ON 11:19 |

*This is the process to ask for help with a complaint.*

Claimant Name: AL FISHER    CDCR #: T-42408 Current Housing/Parole Unit: CTC 2/106

Institution/Facility/Parole Region: CSP-SAC

In order for the Department to understand your complaint, make sure you have answered the following questions:

- What is the nature of your complaint?
- When and where did the complaint occur?
- Who was involved?
- Which specific people can support your complaint?
- Did you try to informally resolve the complaint?
- What rule or policy are you relying on to make your complaint?
- Are there documents that would be helpful to support your position? List the documents if you do not have them. Please note that documents submitted with this form will not be returned.
- What specific action would resolve your complaint?

I FILED (2) P.R.E.A. COMPLAINTS IN THE PAST FEW MONTHS FOR SEXUAL HARRASSMENT, THEN FOR FURTHER HARRASSMENT FOR FILING THAT COMPLAINT AND I STATED I HAD CONCERNS OFFICER'S WERE TRYING TO HAVE ME HURT OR KILLED BY TELLING INMATES I'M A SNITCH, RAPIST, CHILD MOLESTER AND SEX OFFENDER, AND THEY NEED TO GET ME OFF THE YARD. I WAS TALKED TOO BY I.S.U.(I BELIEVE) AFTER FAST COMPLAINT BUT NOTHING WAS DONE AND THE HARRASSMENT GOT WORSE. ON APRIL 20, 2022 I WAS FALSELY ACCUSED OF SEXUAL MISCONDUCT BY A FEMALE OFFICER (C/O DIAZ). AT FIRST SHE ON FLOOR STAFF SHE SAW ME ACTUALLY MASTURBATING STANDING AT MY CELL DOOR & SAW ME STROKING MY PENIS AND HAD FLOOR OFFICER'S ESCORT ME TO PROGRAM OFFICE HOLDING CAGE TO BE SENT TO AD-SEG. WHEN I EXPLAINED TO SGT. PORTER THERE'S NO WAY SHE COULD OF SEEN ME MASTURBATING OR STROKING MY PENIS I'M 5'6 TALL AND THE WINDOW ON CELL DOOR COME UP TO MY CHEST AREA. SO SHE COULD NEVER HAVE SEEN ME STROKING MY PENIS OR MY PENIS FROM THE CONTROL BOOTH & ASKED HIM TO GO INVESTIGATE. WHICH HE WAS KIND TO DO SO, AND WENT TO THE BUILD-ING TO SEE. AT WHICH TIME SHE CHANGED HER STORY & SAID SHE COULDN'T SEE MY GROIN AREA UT I WAS SUPPOSEDLY MOVING MY HAND UP AND DOWN, SO SGT. PORTER DIDN'T SEND ME TO AD-SEG. UT SHE WROTE ME UP FOR SEXUAL MISCONDUCT. WHEN I RETURNED TO BUILDING I ASKED HER WHY SHE IS LIKE DID THAT. SHE TOLD ME ... "JUST LIKE YOU SNITCHED AND LIED ON M.S. GALYEN"! REFERRING TO THE FIRST P.R.E.A COMPLAINT I FILED. THEN I KNEW WHAT WAS GOING ON AND WAS AFRAID I TOLD MY C/O DIAZ UNICIAN I, SHE SAID TO WRITE IT UP BUT I WAS SCARED. A FEW DAY'S LATER SHE WORKED IN OUR CONTROL BOOTH AGAIN, SHE WAS TALKING TO INMATE JETTON #F-64512 THROUGH DAYROOM WINDOW AND AS I WALKED IN I HEARD HER SAY... "SOMEBODY NEED TO FUCK THAT SNITCH UP"! I SAID... "WHO THE FUCK YOU TALKING

DISTRIBUTION    Original: Claimant's File    Copies: DAI, DAPO, and Claimant

STATE OF CALIFORNIA
**GRIEVANCE**
CDCR 602-1 (03/20)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Page 2 of 2

ABOUT"? SHE SLAMMED THE WINDOW SHUT. I ASKED HIM (JETTON) WAS SHE TALKING ABOUT ME, HE SAID "YOU'RE THE ONLY ONE OVER HERE". I WENT TO MY CELL. ON MAY 5, 2022 I OVERHEARD C/M JETTON TALKING TO AN INMATE ON THE TIER WHILE I WAS IN MY CELL WHOM I COULDN'T SEE, SAYING... "YEAH I'M GOING TO GET THAT FOUL AT YARD, OFFICER'S WON'T HIM "HIT" AND OFF THE YARD". THE OTHER INMATE ASKED WHO; C/M JETTON SAID "AL", MEANING ME. AT YARD I WENT TO ASK JETTON ABOUT WHAT I HEARD, HE THEN CALLED ME A "JACK-OFF ARTIST" AND SEX OFFENDER AND APPROACHED ME THREATENLY. I WAS WALKING AWAY AND HE BEGAN ATTACKING ME, THEN I BEGAN DEFENDING MYSELF. THEY USED EXCESSIVE FORCE TO SEPERATE US AND WE WAS THEN PLACED IN HOLDING CAGES. C/M JETTON REFUSED TO SIGN THE CHRONO BUT THEY SENT HIM BACK TO THE BUILDING EVEN THOUGH HE'S HAD AT LEAST (3) FIGHT'S IN THE PAST (9) MONTHS AND I HAD NONE SINCE ARRIVING (9) MONTHS AGO. THEIR EXCUSE FOR SENDING ME OFF THE YARD IN FIRST (114 LOCK-UP ORDER). I RECIEVED WAS I HAD A NON-CONFIDENTIAL ENEMY (JETTON) AND "DISCOVERED" I HAD A CONFIDENTIAL ENEMY ON YARD AS WELL. I REVIEWED A REVISED 114 BY LT. MORROW ON 5-6-22 NOT MENTIONING A CONFIDENTIAL ENEMY. I KNOW THIS WAS A CONCERTED EFFORT BY OFFICER'S TO HAVE ME ATTACKED AND REMOVED FROM 1-YARD BECAUSE C/M JETTON WAS THE FIRST PERSON OFFICER ~~TOLD~~ MARTELL TOLD I WAS A SEX OFFENDER, ETC. AS I STATED ON FIRST P.R.E.A. COMPLAINT. FURTHER PROOF IS HOW THEY KEPT ME LOCKED IN THAT CAGE FOR APPROX. (11) HOUR'S WITH NO MEDICAL TREATMENT AND I BELIEVE TOLD THE NURSE WHO DID THE 7219 FORM TO PUT I HAD NO INJURIES WHEN IT WAS EVIDENT I DID. INJURIES THAT I WAS LATER SENT OUT TO HOSPITAL (U.C. DAVIS) WITH A LACERATION ON MY UPPER LIP THAT HAD TO BE STITCHED UP, AND CONTUSIONS TO HEAD, SWELLING IN JAW & OTHER CUT'S, SCRAPES & ABRASIONS, WHICH THEY TRIED TO COVER UP & WOULDN'T LET THE DOCTOR TREAT ME IMEDIATELY AFTER I WAS ATTACKED. OTHER PROOF IS CAMERA FOOTAGE THAT JETTON ATTACKED ME BUT THEY INSINUATED ON 114 I WAS THE ATTACKER WHEN OFFICER'S SEEN ENTIRE INCIDENT. C/M JETTON IS KNOWN OFFICER'S IN 6-BLOCK "HIT-MAN" AND THIS IS EVIDENT BY THE NUMEROUS FIGHT'S HE'S HAD IN THE BLOCK IN MONTHS WITH NO RE-PRECUSSION'S SUCH AS C-STATUS OR LOSS OF HIS LEAD PORTER JOB, SHOWING COLLUSION. I WOULD LIKE FOR VIDEO FOOTAGE OF INCIDENT AND HOLDING CAGE AREA TO BE PRESERVED FOR CIVIL LITIGATION AND CRIMINAL INVESTIGATION FOR I WANT TO FILE CHARGES ON C/M JETTON AND ALL OFFICER'S INVOLVED IN THE COVER-UP OF THIS ASSAULT & BATTERY WITH GREAT BODILY INJURY ON ME. AND VIOLATING MY CIVIL RIGHTS BY KEEPING ME IN THAT CAGE WELL OVER (4) HOUR'S. I WOULD ALSO LIKE TO BE TRANSFERRED FROM THAT PRISON IMEDIATELY BECAUSE I'M STILL BEING HARRASED AND FEAR THESE OFFICER'S WILL TRY TO HURT OR KILL ME NEXT...!!!

Reminder: Please attach all documents in your possession that support your claim(s).

Please note that this form and supporting documents will not be returned to you.

Claimant Signature: *Al Fisher*          Date Signed: 5-9-22

CALIFORNIA DEPARTMENT *of*
Corrections and Rehabilitation

# OFFICE OF GRIEVANCES DECISION

**Offender Name:** FISHER, AL GENE Jr          **Date:** 05/18/2022

**CDC#:** J42468

**Current Location:** SAC-Facility B          **Current Area/Bed:** B 008 1 - 022001L

**Log #:** 000000255170

---

## Claim #: 001

**Received at Institution/Parole Region:**      California State Prison, Sacramento
**Submitted to Facility/Parole District:**       SAC-Facility A
**Housing Area/Parole Unit:**
**Category:**   General Employee Performance          **Sub-Category:**   Other Staff Misconduct - NOS

The California Department of Corrections and Rehabilitation received your grievance on 05/11/2022 which you submitted on 05/09/2022.

Pursuant to the California Code of Regulations, title 15, your claim has been identified as an allegation of staff misconduct, meaning it will be referred outside the grievance and appeal process to an appropriate authority within the Department for the purpose of gathering facts needed to prove or disprove the allegation. A separate response will be provided to you at the conclusion of that process. This decision exhausts all administrative remedies available to you for this claim.

**Decision: Allegation of Staff Misconduct**

---

## Claim #: 002

**Received at Institution/Parole Region:**      California State Prison, Sacramento
**Submitted to Facility/Parole District:**       SAC-Facility A
**Housing Area/Parole Unit:**
**Category:**   Offender Services          **Sub-Category:**   Allegation against Inmate/Parolee

The California Department of Corrections and Rehabilitation received your grievance on 05/11/2022 which you submitted on 05/09/2022. Your allegation against an inmate or parolee was redirected to appropriate staff in accordance with the California Code of Regulations, title 15.

Your claim will be addressed by appropriate staff at California State Prison, Sacramento, as determined by the Reviewing Authority.

If you are dissatisfied with this response you may appeal this decision by mailing the CDCR Form 602-2 included in this response to the California Department of Corrections and Rehabilitation, Office of Appeals. Do not resubmit this claim to the Office of Grievances.

**Decision: Redirected**

**CDCR**                              **INCIDENT REPORT PACKAGE**                      **PAGE:** 28
**REPORT NO. IRTR161 - 12**                                                           **PROCESSED:** 06/03/2022  07:35
                          **INCIDENT LOG NUMBER: 000000000038394**                    **REQUESTOR:** L. Bales

### STAFF NARRATIVE

**STAFF NAME:** Guerra,                                    **NARRATIVE TYPE:** Initial Report
**CREATED DATE:** 05/05/202                                **CREATED TIME:** 18:55:19

#### NARRATIVE

On Thursday, May 5, 2022, at approximately 1248 hours, I was performing my duties as A Facility Yard Officer #1 (Post# 222021). While observing the yard from the upper sally port area I observed Inmate JETTON (F64512/FA6-131L) and Inmate FISHER (J42468/FA6-228U) engaged in combat. Both inmates were identified via the Strategic Offenders Management System (SOMS). Inmate JETTON and Inmate FISHER were utilizing both fists and striking each other in the head and upper torso area. Via my Institutional Radio, I summoned a Code 1 response for a 1 on 1 fight near the upper handball court. Observation gave a direct order of "Down on the Yard" using the Public Address System (PA). The lawful order had negative results on the combative inmates as they continued fighting.  I immediately responded to the incident. Multiple lawful orders to "get down" from responding staff were ignored by both inmates. At this time, I observed Officer D. Martin underhand toss a CS Instantaneous Blast Grenade (IBG) from approximately 15 feet away. The IBG detonated approximately 3 feet from the feet of the combative inmates yielding a negative effect on subduing the attacks by both inmates. A skirmish line was being formed on the hard track near the incident. At this time I moved an uninvolved inmate off the hard track and away from the skirmish line. As I relocated the incident, multiple IBG's deployed near the combative inmates. Due to my focus on moving the uninvolved inmate, I was unable to determine the distance, the methodology, nor the origin of the IBG's. The grenades had a negative effect on subduing the continued attacks by both inmates. Multiple direct orders continued to be ignored by the combative inmates as the fight transitioned to the ground. In order to gain compliance with a lawful order, subdue the attackers, and effect custody I underhand tossed an OC Instantaneous Blast Grenade from approximately 15 feet away aiming at the right foot of Inmate JETTON. The grenade detonated approximately 1 foot from the combative inmates. Multiple IBG's detonated near the fighting inmates at approximately the same time. Due to my focus on my IBG, I was unable to determine the distance, the methodology, nor the origin the IBG's were deployed. All IBG's had a negative effect, and the inmates continued striking each other. I transitioned to my MK9 Pepper spray and assessed the combative inmates. I gave Inmate JETTON a direct order to stand up and distance himself from Inmate FISHER because he was on top; however, both inmates remained engaged in combat. Inmate FISHER was actively striking from the ground and Inmate JETTON was actively striking from a top position. At this time I observed Officer MARTIN utilize his MK9 OC Pepper Spray from approximately 6 feet away. Martin used 2 consecutive bursts of spray. Each burst of spray was approximately 2 second in length. The spray struck the face and upper torso area of both inmates yielding in a positive effect to subdue both attackers. Both inmates separated and assumed a prone position; cover/contact teams were utilized to secure the involved inmates. Inmate FISHER was secured without incident and escorted to the A Pedestrian Sally Port. At this time I secured Inmate JETTON in mechanical restraints and performed a clothed body search with negative results for contraband. I assisted Inmate JETTON to a standing position and proceeded to escort him to the A Facility Pedestrian Sally Port, Holding Cell #7. I conducted a search of holding before placing JETTON inside which yielded negative results for contraband. I conducted an unclothed body search on Inmate JETTON with negative results for contraband. Medical staff performed a CDCR 7219 medical evaluation on Inmate JETTON. At this time I offered GREEN fresh clothes and a decontamination shower. JETTON accepted both. I escorted JETTON to the decontamination shower where he was allowed to decontaminate with copious amounts of cool, to the touch, running water. I conducted a search of the decontamination shower before allowing JETTON to enter with negative results for contraband. JETTON alerted me when he finished decontamination. I escorted JETTON back to holding cell #7. Prior to placing JETTON back into holding cell #7, I conducted another search of the holding cell with negative results for contraband. A clean state issue white T-shirt, as well as a clean pair of boxers was afforded to Inmate JETTON. This concludes my involvement in the incident.

T. Guerra                                                           **DATE:** 05/05/2022
STAFF SIGNATURE

**BADGE**                                             **PERN**

**NARRATIVE REVIEWED:** Yes                          **REVIEWED BY STAFF:** Larsen,
        **REVIEWED DATE:** 05/05/2022                **REVIEWED TIME:** 19:41:42

**CDCR**
**REPORT NO. IRTR161 - 12**

**INCIDENT REPORT PACKAGE**

**INCIDENT LOG NUMBER: 000000000038394**

**PAGE:**  23
**PROCESSED:** 06/03/2022 07:35
**REQUESTOR:** L. Bales

**STAFF NARRATIVE**

**STAFF NAME:** Martin

**CREATED DATE:** 05/05/2022

**NARRATIVE TYPE:** Initial Report

**CREATED TIME:** 21:10:56

**NARRATIVE**

On Thursday, May 5, 2022 at approximately 1248 hours, while working my assigned post as A Yard 3, I was monitoring the main yard and observed two inmates later identified by their state issued identification cards as Inmates JETTON (F64512, FA3-131L), and FISHER (J42468, FA6-228U) striking each other with both fists in the head and upper torso areas. Officer T. Guerra notified A Facility Observation to put the yard down and notified central control via institutional radio of a 1 on 1 fight on the upper track near the hand ball court on A Facility. A-facility observation announced via the public address system for all inmates on the yard to get down. All inmates complied with the exception of JETTON and FISHER as they continued to fight. As I responded to the incident. Yard staff including myself established the skirmish line. JETTON and FISHER managed to make their way onto the handball court. Both inmates fell to the ground with JETTON straddling FISHER, both inmates continued to strike each other with closed fists to their upper torso and facial area. I ordered both inmates to get down with negative results, as they continued to fight each other. In order to gain compliance with a lawful order, and subdue their ongoing attack of each other, I deployed one (1) 1040 Chlorobenzylidene Malonontrile (CS) instantaneous blast grenade (IBG) from approximately 12 feet away utilizing an underhand toss, aiming towards the ground next to the fighting inmates. The IBG detonated approximately 3 feet away from the inmates, the use of force yielded negative results as they continued to fight. Responding staff continued to give orders for both inmates to get down. JETTON and FISHER ignored all orders and continued to fight. I observed multiple IBG's being deployed from responding staff. Due to my focus on JETTON and FISHER I was unable to determine the distance at which they were deployed or who deployed them or the method utilized in deploying them. I ordered both inmates to get down with negative results as they continued to fight. I deployed one 1040 Oleoresin Capsicum (OC) IBG from approximately 10 feet away utilizing an underhand toss, aiming towards the ground next to both inmates. The IBG detonated approximately 2 feet away from both inmates. The combined use of force yielded negative results as both inmates continued to fight. The skirmish line advanced forward, I ordered both inmates to get down with negative results as both inmates still continued to strike each other in the face. I administered one approximate 2 second burst of OC pepper spray from approximately 6 feet away, aiming toward FISHER's facial area. The OC made contact with my intended target. I then continued to order both inmates to get down, with negative results. I administered a second  approximate 2 second burst of OC pepper spray from approximately 6 feet away aiming towards JETTON's facial area, making contact with my intended target. The use of force yielded positive results as both inmates separated and assumed a prone position on the ground. Cover/ contact teams were assigned. Officer Guerra placed JETTON into handcuffs, performed a clothed body search yielding negative results for contraband. We assisted JETTON to his feet and escorted him to the A Facility Pedestrian Sally port. Officer Guerra placed JETTON into Temporary holding cell 4 Officer Guerra performed an unclothed body search yielding negative results for contraband. JETTON was escorted to the decontamination shower where he was afforded copious amounts of cool running water for further decontamination. Once satisfied, JETTON was then placed back into THC 4. JETTON was offered clean clothing to which he accepted. This concludes my involvement in this incident.

D. Martin

**DATE:** 05/05/2022

STAFF SIGNATURE

**BADGE #**

**PERNR:**

**NARRATIVE REVIEWED:** Yes

**REVIEWED DATE:** 05/05/2022

**REVIEWED BY STAFF:** Larsen,

**REVIEWED TIME:** 21:31:40

| | | |
|---|---|---|
| **CDCR**<br>**REPORT NO. IRTR161 - 12** | **INCIDENT REPORT PACKAGE**<br>**INCIDENT LOG NUMBER: 000000000038394** | **PAGE:** 30<br>**PROCESSED:** 06/03/2022  07:35<br>**REQUESTOR:** L. Bales |

## STAFF NARRATIVE

| | |
|---|---|
| **STAFF NAME:** Tapia, ● | **NARRATIVE TYPE:** Initial Report |
| **CREATED DATE:** 05/05/202● | **CREATED TIME:** 17:17:33 |

### NARRATIVE

On Thursday, May 5, 2022 at approximately 1248 hours, while performing my duties as A Yard Officer 4 Post # 222024. I saw two inmates fighting each other on the upper hand ball court on A facility main yard, who were later identified by state issued Identification cards (ID) as INMATE FISHER (J42468, FA6-228) and INMATE JETTON (F64512, FA6-131). FISHER and JETTON were striking each other with their fist in the upper torso and face. Institutional radio call was made and A Observation put the yard down. The yard got down but FISHER and JETTON continued fighting. The Yard Officers and myself responded to the incident creating a skirmish line and gave both inmates multiple orders to get down, to which they did not comply. I immediately gave the inmates a direct order to get down with negative results. To gain compliance with a lawful order and subdue an attacker. I deployed an Instantaneous Blast Grenade (IBG) with an under hand toss, from approximately 10 feet away, aiming 3 feet away from the fight, the IBG landed approximately 3 feet away and was not effective. Simultaneously, I observed multiple IBG's detonate near the fight. Due to my position on the skirmish line and focus on the fight, I was unable to identify who deployed the IBG's, from what distance they were deployed, and the method they used to toss the IBG's. The combine use of force was not effective and the inmates continued striking each other in the upper torso. Once the IBG's detonated, I continued to give multiple direct orders to stop fighting with negative results. I deployed a second IBG with an under hand toss, from approximately 10 feet away, aiming 3 feet away from the fight, the IBG landed approximately 2 feet away from the fight, and was not effective. Simultaneously, I observed multiple IBG's detonate on the ground near the fight. Due to my position on the skirmish line and focus on the fight, I was unable to identify who deployed the IBG's, from what distance they were deployed, and the method I utilized to toss the IBG's. The combined use of force was still not effective. I then observed Officer D. Martin utilize his MK 9 OC Pepper Spray and deploy an approximate 2 second burst, from approximately 6 feet away, striking FISHER in his facial area. I observed Officer D. Martin utilize his MK 9 OC Pepper Spray again and deploy an approximate 2 second burst, from approximately 6 feet away, striking JETTON in his facial area. The OC Pepper Spray had a positive effect on both inmates, as they both got down in a prone position. More responding staff arrived to support the skirmish line. Cover and contact staff were assigned. I approached inmate FISHER and placed him in restraints. I then conducted a clothed body search and obtained negative results. I then escorted inmate FISHER down to the A Pedestrian Sally Port where a medical evaluation was documented on a CDCR 7219 and medical provided inmate FISHER with his inhaler due to trouble breathing. Prior to placing FISHER in to holding cell #3, I conducted a visual inspection of the holding cell, which yielded negative results for contraband, and placed FISHER into holding cell # 3. I then proceed with an unclothed body search, which yielded negative results for contraband. I offered FISHER a decontamination shower which he accepted. I placed FISHER in restraints and moved FISHER to the decontamination holding cell, where I provided inmate FISHER with cool running water for approximately 2 minutes. After FISHER was decontaminated, I provided FISHER with clean clothing, placed him into handcuffs, removed him from the decontamination holding cell, and escorted him back to holding cell # 3. This concludes my involvement in this incident.

| | |
|---|---|
| C. Tapia | **DATE:** 05/05/2022 |
| STAFF SIGNATURE | |
| **BADGE** ● | **PERNR:** ● |
| **NARRATIVE REVIEWED:** Yes | **REVIEWED BY STAFF:** Larsen, ● |
| **REVIEWED DATE:** 05/05/2022 | **REVIEWED TIME:** 19:42:01 |

**CDCR**
**REPORT NO. IRTR161 - 12**

**INCIDENT REPORT PACKAGE**

**INCIDENT LOG NUMBER: 000000000038394**

**PAGE:** 26
**PROCESSED:** 06/03/2022 07:35
**REQUESTOR:** L. Bales

## STAFF NARRATIVE

**STAFF NAME:** Schultze

**CREATED DATE:** 05/05/2022

**NARRATIVE TYPE:** Initial Report

**CREATED TIME:** 19:59:40

### NARRATIVE

On Thursday, May 5, 2022 at approximately 1248 hours, while performing my duties as A Yard 2, I observed two inmates, later identified by their state issued identification cards as JETTON (F64512, FA6-131L) and FISHER (J42468, FA6-228U) engaged in a fight. Both inmates were striking each other in the face and upper torso with their fists. I and the yard officers responded to the incident location on the hard track near the metal tables by A facility 4 block. As we neared the incident we gave verbal orders to the inmates to "get down" and "stop fighting", having negative results as both inmates continued to strike each other in the facial area. As the inmates continued to fight they fell to the ground but continued to strike each other in the facial area. One instantaneous blast grenade (IBG) detonated on the ground approximately five feet from the fighting inmates with negative results as they continued to strike each other in the facial area. Due to my focus on the fighting inmates, I was not able to identify which officer deployed the grenade, nor the type of IBG utilized or the deployment method used. Responding staff formed a skirmish line on the hard track and continued to give verbal orders to the fighting inmates to "get down" and "stop fighting", with negative results as they continued to strike each other in the facial area. Officer D. Martin deployed an IBG utilizing an underhand toss from approximately 15 feet away, which landed and detonated approximately 3 feet from the combatants having negative results as the inmates continued to strike each other in the facial area. Due to my focus on the fighting inmates I was unable to positively identify the type of IBG utilized. As the combatants continued to fight, to gain compliance with a lawful order and subdue the attackers and with the imminent threat of serious bodily injury, I deployed one instantaneous blast OC grenade utilizing an underhand toss from approximately 15 feet away aiming at the ground in front of the inmates. The IBG landed and detonated on the ground approximately two feet from the fighting inmates having negative results as the inmates continued to strike each other in the facial area. As the inmates continued to strike each other and not comply with direct orders, simultaneously two IBG's landed and detonated approximately one foot from the fighting inmates having negative results as the inmates continued to strike each other in the facial area. Due to my focus on the combatants I was not able to identify which officers deployed the grenades, nor the type of IBG's utilized or the deployment method's used. The combatants continued to fight, to gain compliance with a lawful order and subdue the attackers and with the imminent threat of serious bodily injury occurring, I deployed one instantaneous blast CS grenade utilizing an underhand toss from approximately 15 feet away aiming at the ground in front of the inmates. The IBG landed and detonated on the ground approximately one foot from the combatants having negative results as the inmates continued to strike each other in the facial area. The fighting inmates continued striking each other and Officer Martin moved closer with the skirmish line to the combatants and deployed two approximately two second bursts of his state issued MK-9 high volume streamer OC pepper spray from approximately 6 feet away striking each inmate in the facial area. This OC pepper spray had positive effects as the combatant's separated and took a prone position on the ground. Cover/contact teams were assigned and restrained the combatants and escorted them from the yard. This concludes my involvement with this incident.

J. Schultze

**DATE:** 05/05/2022

STAFF SIGNATURE

**BADGE**

**PERN**

**NARRATIVE REVIEWED:** Yes

**REVIEWED DATE:** 05/05/2022

**REVIEWED BY STAFF:** Larsen

**REVIEWED TIME:** 20:10:04

# EXHIBIT

EXHIBIT:_____(F)_____



## California State Prison - Sacramento

# HOLDING CELL LOG

Holding Cell# **3**

| INMATE NAME | CDCR NUMBER | PRIOR HOUSING | PLACEMENT DATE |
|---|---|---|---|
| Fisher | J42468 | A6-228 | 5/5/2022 |

| PLACEMENT ORDERED BY (PRINT NAME): | C. LARSEN | SIGNATURE: | |
|---|---|---|---|

| REASON FOR PLACEMENT: | Fighting |
|---|---|

| SECURED IN CELL BY (PRINT NAME): | Tapia | SIGNATURE: | |
|---|---|---|---|

| CELL SEARCHED BY (PRINT NAME): | Tapia | SIGNATURE: | |
|---|---|---|---|

| RESULTS OF CELL SEARCH: | Negative |
|---|---|

| UNCLOTHED BODY SEARCH BY (PRINT NAME): | Tapia | SIGNATURE: | |
|---|---|---|---|

| RESULTS OF UNCLOTHED SEARCH: | Negative |
|---|---|

| Spit Net Utilized: ☐YES ☒NO ☐N/A | Constant Supervision while in Spit Net: ☐YES ☒NO | Time Spit Net Removed N/A |
|---|---|---|
| Inmate left in Restraints (Safety): ☐YES ☒NO ☐N/A | Constant Supervision while in Restraints: ☐YES ☒NO | Time Restraints Removed N/A |
| Clothing Taken: ☒YES ☐NO ☐N/A | Clean Clothing Provided: ☒YES ☐NO | Time Clothing Provided |

## INMATE WELFARE CHECKS SHALL BE CONDUCTED NO LESS THAN EVERY 15 MINUTES

| Time Secured In Holding Cell | 1300 | Time Released From Holding Cell | 2350 | Total Time In Holding Cell | 11h 50m |
|---|---|---|---|---|---|

| Time Checked | PRINT NAME | SIGNATURE | General Comments, Abnormal Behavior, Activity, etc. |
|---|---|---|---|
| 1315 | Gebo | | Standing |
| 1330 | Gebo | | Standing |
| 1345 | Gebo | | Standing |
| 1400 | Joseph | N. | Standing |
| 1415 | Joseph | N. | Standing |
| 1430 | Joseph | N. | Standing |
| 1445 | Joseph | N. | Standing |
| 1500 | Joseph | N. | Standing |
| 1515 | Joseph | N. | Standing |
| 1530 | Joseph | N. | Standing |
| 1545 | Joseph | N. | Standing |
| 1600 | Joseph | N. | Standing / Count |
| 1615 | Joseph | N. | Standing |

☒ Check the box if welfare checks are continued on second page.

*ANY CONFINEMENT WHICH MAY EXCEED FOUR (4) HOURS, MUST OBTAIN APPROVAL OF THE FACILITY CAPTAIN OR AOD*

| RELEASED FROM CELL BY (PRINT NAME): | A. DIAZ | SIGNATURE: | | DATE: 5/6/22 |
|---|---|---|---|---|
| CELL SEARCHED BY (PRINT NAME): | A. DIAZ | SIGNATURE: | | DATE: 5/6/22 |
| RESULTS OF CELL SEARCH: | NEG | | | |

Disposition of Inmate: ☐ Return to Bed/Cell ☐Transferred ☐ ASU ☒Other (Explain) ASHM

*(Revised 02/2018)*        *This Log will be maintained For a Period of One (1) Year.*        *(2 Sided form-over)*

(over)

**CDCR**
**REPORT NO. IRTR161 - 12**

**INCIDENT REPORT PACKAGE**

**INCIDENT LOG NUMBER: 000000000038394**

**PAGE:** 20
**PROCESSED:** 06/03/2022  07:35
**REQUESTOR:** L. Bales

### STAFF NARRATIVE

**STAFF NAME:** Stigelmayer
**CREATED DATE:** 05/05/2022

**NARRATIVE TYPE:** Initial Report
**CREATED TIME:** 14:37:13

#### NARRATIVE

**SYNOPSIS**
On Thursday, May 05, 2022 at approximately 1248 hours, Inmate FISHER (J-42468/FA6-228) and Inmate JETTON (F-64512/FA6-131) was in violation of California Code of Regulations, Title 15, section 3005(d)(1), Fighting Resulting in UOF.

Specifically, FISHER and JETTON started fighting by punching each other in the upper body area in A Facility Main Yard on the upper hand ball court. Staff responded to the area and formed a skirmish line. Direct orders were given to "stop fighting", however, FISHER and JETTON continued to fight. Force was used to quill the incident, OC Pepper Spray x2, CS grenade x3, OC grenade x4. FISHER and JETTON both stop fighting and prone out on the ground. FISHER and JETTON secured in handcuffs and escorted to A Facility Sally Port.

**FISHER**
FISHER had chemical agent exposure documented on the CDCR 7219 with injuries to the head and left and right elbows.

FISHER except a decontamination shower and was decontaminate with outside moving air. FISHER received clean clothing.

Due to FISHER participation in the Mental Health Services Delivery System at the Enhanced Out Patient level of care, a Mental Health Referral Chrono (CDCR 128-MH5) was submitted and distributed.

FISHER will be issue a Rules Violation Report, charging him with CCR 3005 (d)(1) Fighting.

**JETTON**
JETTON had chemical agent exposure documented on a CDCR 7219 with no injuries.

JETTON except decontamination shower and was decontaminate with outside moving air. JETTON received clean clothing.

Due to JETTON participation in the Mental Health Services Delivery System at the Enhanced Out Patient level of care, a Mental Health Referral Chrono (CDCR 128-MH5) was submitted and distributed.

JETTON will be issue a Rules Violation Report, charging him with CCR 3005 (d)(1) Fighting.

**ADDITIONAL INFORMATION**
The affected area was decontaminated with outside cool air and water.

Force used and a Code-1 response was summoned via facility radio and Personal Alarm Device. Inmates and staff received no injuries because of this incident. All appropriate Administrative Staff notified of this incident via electronic mail and with the submission of this report.

J. Stigelmayer
**STAFF SIGNATURE**

**DATE:** 05/12/2022



**BADGE #**

**PERN**

**NARRATIVE REVIEWED:** Yes
**REVIEWED DATE:** 05/12/2022

**REVIEWED BY STAFF:** Colvin,
**REVIEWED TIME:** 11:59:3

CDCR                                    **INCIDENT REPORT PACKAGE**                    **PAGE:** 21
**REPORT NO. IRTR161 - 12**                                                            **PROCESSED:** 06/03/2022  07:35
                          **INCIDENT LOG NUMBER: 000000000038394**                     **REQUESTOR:** L. Bales

### STAFF NARRATIVE

---

**STAFF NAME:** Stigelmaye●                           **NARRATIVE TYPE:** Supplemental Report
**CREATED DATE:** 05/22/2022                          **CREATED TIME:** 23:33:53

#### NARRATIVE

The holding cell log notes a total time of 11 hours and 50 minutes. AOD approval was given at approximately 4 hours for the reason of ASU housing/property. OP#6 states, "Every attempt shall be made to not retain an inmate in a holding cell longer than four hours." Please provide information for length of time within the holding cell.

FISHER was placed in holding cell number three for approximately 11 hours and 50 minutes. Staff was waiting on all appropriate documentation for Administrative Segregated Housing (AD-SEG) placement and an AD-SEG intake cell. During this time FISHER did not pass his AD-SEG placement. Waiting on FISHER to be cleared before an AD-SEG check in can be complete. Psych. had to be called in from off grounds. FISHER made claims of pain in his jaw. FISHER was escorted to building 56 and transported to an outside hospital. FISHER returned with no further injuries.

J. Stigelmayer                                                          **DATE:** 05/22/2022
STAFF SIGNATURE

                          **BADGE #** ●                      **PERNR** ●

            **NARRATIVE REVIEWED:** Yes                      **REVIEWED BY STAFF:** Andes,
            **REVIEWED DATE:** 05/23/2022                    **REVIEWED TIME:** 15:37:1●

---

**STAFF NAME:** Larser●                               **NARRATIVE TYPE:** Initial Report
**CREATED DATE:** 05/06/202●                          **CREATED TIME:** 00:09:37

#### NARRATIVE

On Thursday, May 5, 2022, at approximately 1248 hours while performing my duties as A Program Sergeant EOP I responded to a Code 1 Radio call for a One on One fight on the Main Yard near the handball court. As I was responding uninvolved inmates were in a seated or prone position. I heard what sounded like several Instantaneous Blast Grenades (IBG's) which did not appear to be effective. Due to the inmates still fighting on the handball court. Due to my distance and position behind responding staff, I was unable to identify who deployed the IBG's, how many were deployed, from what distance and where they landed. As I got closer to the incident the 2 involved inmates were still fighting striking each other in the head and upper torso area. I observe Officer D. Martin utilize his MK9 OC Pepper Spray striking both inmates in the facial area. The Use of Force appeared to be effective as both inmates stopped fighting, separated and moved to a prone position on the ground. A skirmish line was formed on the track facing the incident, cover and contact officers were assigned and involved inmates were escorted to the Facility "A" Sally Port for 7219 medical evaluations and secured into holding cells.
7 detonated IBG's, spoons and pins were collected and the affected area was decontaminated by rinsing the IBG powder with copious amounts of water into the grass. Used IBG's were replace by A Facility Control. This concludes my involvement.

C. Larsen                                                               **DATE:** 05/06/2022
STAFF SIGNATURE

                          **BADGE #** ●                      **PERNR** ●

            **NARRATIVE REVIEWED:** Yes                      **REVIEWED BY STAFF:** Kendall,
            **REVIEWED DATE:** 05/06/2022                    **REVIEWED TIME:** 00:16:15

# EXHIBIT

EXHIBIT:_____(G)_____

STATE OF CALIFORNIA
**MEDICAL REPORT OF INJURY
OR UNUSUAL OCCURRENCE**
CDCR 7219 (Rev. 01/18)

DEPARTMENT OF CORRECTIONS AND REHABILITATION

Page 1 of 2

| NAME OF INSTITUTION | LOCATION OF EVALUATION | DATE |
|---|---|---|
| CSP SAC | A BREEZE WAY | 05/05/2022 |

REASON FOR REPORT ☐ ALLEGATION   ☐ ON THE JOB INJURY   ☐ USE OF FORCE   ☐ INJURY   ☐ OTM RETURNS
☑ UNUSUAL OCCURRENCE   ☐ PRE AD/SEG ADMISSION   ☐ R&R   ☐ OTHER _____

| NAME | LAST | FIRST | CDCR NUMBER | PERNR / INST. ID # | VISITOR ID # (SOMS) |
|---|---|---|---|---|---|
| JETTON | | ANTHONY | F 64512 | NA | NA |

| PLACE OF OCCURRENCE | DATE OF OCCURRENCE | TIME OF OCCURRENCE | TIME SEEN | RN NOTIFIED TIME | PHYSICIAN NOTIFIED TIME |
|---|---|---|---|---|---|
| A MAIN YARD | 05/05/22 | 1245 | 1330 | 1325 | 1335 |

BRIEF STATEMENT IN SUBJECT'S WORDS OF THE CIRCUMSTANCES OF THE INJURY OR UNUSUAL OCCURRENCE

" No Comments "

| INJURIES FOUND? YES (NO) | |
|---|---|
| Abrasion/Scratch | 1 |
| Active Bleeding | 2 |
| Broken Bone | 3 |
| Bruise/Discolored Area | 4 |
| Burn | 5 |
| Dislocation | 6 |
| Dried Blood | 7 |
| Fresh Tattoo | 8 |
| Cut/Laceration/Slash | 9 |
| Swollen Area | 10 |
| Pain | 11 |
| Protrusion | 12 |
| Puncture | 13 |
| Reddened Area | 14 |
| Skin Flap | 15 |
| Pre-Existing | 16 |
| Other | 17 |
| | 18 |

| Chemical Agent Exposure? | (YES) NO |
|---|---|
| Chem. Agent Exposure Area | EX |
| Decontaminated w/ Water? YES / NO / REFUSED | |
| Decontaminated w/ Air? YES / NO / REFUSED | |
| Self-decontamination Instructions given ? | (YES) NO |
| Staff issued Exposure packet ? | YES / NO |

Q 15 min. check times

| Initial | 1st Check |
|---|---|
| 1330 ℍ | 1345 ℍ |
| 2nd Check | Final |
| 1400 ℍ | 1415 ℍ RTC |

TIME/DISPOSITION  1415 RTC

Right    Left

Front    Back

| REPORT COMPLETED BY (PRINT AND SIGN) | PERNR / INST. ID # | RDOs | ASSIGNMENT AREA |
|---|---|---|---|
| ALEX, RN    Alex RN    98718 | 11100 874 | S/S/H | AFOP PCRN |

**SAC - California State Prison, Sacramento**

Patient:                    **FISHER JR, AL GENE**
DOB/Age/Birth Gender:    11/28/1968 /  53 years    /  Male          CDCR: J42468

---

### Progress Notes

---

1227 On-call provider notified. Ordered code2 UCD r/o head injury

1232 watch commander notified

1245 20g IV placed R AC

0139 EMS arrived.

0146 IP departed TTA via gurney. IP remained stable throughout stay at TTA. Able to ambulate to EMS gurney without assistance. Steady gait. See

Electronically Signed on 05/06/2022 02:03 AM PDT

---

Amavisca, Abraham RN, RN

---

Document Type:                         Progress Note-Nurse
Document Subject:
Service Date/Time                      5/5/2022 23:43 PDT
Result Status:                         Auth (Verified)
Perform Information:                   Edet,Janet RN (5/5/2022 23:51 PDT)
Sign Information:                       Edet,Janet RN (5/5/2022 23:51 PDT)
Authentication Information:            Edet,Janet RN (5/5/2022 23:51 PDT)

**Encounter Info:** Patient Name: AL FISHER,DOB: 11/28/1968,CDCR. J42468,FIN: 10000001911744589J42468,Facility: SAC,Encounter Type Institutional Encounter

At approximately 2245 while observing IP in A-holding cell, IP informed this writer that ne needs sutures on his lip that he got into a fight earlier and he feel his lip is crack open. Unable to get a clear visual of the injury. No acute distress observed. Custody notified to take IP to get medical attention in TTA before MH evaluation. Was informed by custody that IP had already been cleared.

Electronically Signed on 05/05/2022 11:51 PM PDT

---

Edet, Janet RN, RN

---

Document Type:                         Progress Note-Nurse
Document Subject:
Service Date/Time:                     5/5/2022 17:16 PDT
Result Status:                         Auth (Verified)
Perform Information:                   Amavisca,Abraham RN (5/5/2022 17.24 PDT)
Sign Information.                       Amavisca,Abraham RN (5/5/2022 17.24 PDT)
Authentication Information.            Amavisca,Abraham RN (5/5/2022 17.24 PDT)

**Encounter Info:** Patient Name: AL FISHER,DOB: 11/28/1968,CDCR: J42468,FIN: 10000001911744589J42468,Facility. SAC,Encounter Type Institutional Encounter

---

Legend: c=Corrected, @=Abnormal, C=Critical, L=Low, H=High, f=Result Comment, i=Interp Data, *=Performing Lab

---

Report Request ID:  56281690                        Print Date/Time.  6/10/2022 11 17 PDT

**WARNING:** This report contains confidential, proprietary, and/or legally privileged
information intended for the recipient only.

**SAC - California State Prison, Sacramento**
Prison Road
P.O. Box 290002
Represa, CA 95671-

**Patient:**           **FISHER JR, AL GENE**

| | | |
|---|---|---|
| DOB/Age/Birth Gender: | 11/28/1968  53 years | Male |
| Gender Identity | Male | |
| Encounter Date: | 6/28/2021 | |
| Attending | Aung,Nay P&S | |

CDCR #  J42468
PID #: 11744589
Referring

---

## Progress Notes

| | |
|---|---|
| Document Type: | Progress Note-Nurse |
| Document Subject. | |
| Service Date/Time: | 5/6/2022 02:02 PDT |
| Result Status. | Modified |
| Perform Information: | Amavisca,Abraham RN (5/6/2022 03:01 PDT). Amavisca, Abraham RN (5/6/2022 02.03 PDT) |
| Sign Information | Amavisca,Abraham RN (5/6/2022 03 01 PDT). Amavisca, Abraham RN (5/6/2022 02 03 PDT) |
| Authentication Information: | Amavisca,Abraham RN (5/6/2022 03.01 PDT)  Amavisca, Abraham RN (5/6/2022 02 03 PDT) |

**Addendum by Amavisca, Abraham RN on May 06, 2022 3:01 PDT**
 00:06 IP arrived to TTA
00:27 on-call provider notified
00:32 WC notified
00:45 IV placed

---

Electronically Signed on 05/06/2022 03:01 AM PDT

---

Amavisca, Abraham RN, RN

Modified by: Amavisca, Abraham RN, RN on 05/06/2022 03:01 AM PDT

**Encounter Info:** Patient Name. AL FISHER,DOB. 11/28/1968,CDCR: J42468,FIN: 10000001911744589J42468,Facility: SAC.Encounter Type  Institutional Encounter

1206 arrived to TTA via ambulation. steady gait. a/o x4. Calm demeanor. Cooperative. GCS 15. Unlabored breathing. Speaking in full sentences. c/o blurry vision in both eyes and feeling woozy. Denies losing LOC. 8/10 pain in jaw. IP states he was in an altercation around 1pm today. VS bp 130/87, hr 97, o2sat 99% RA, T 36.8 PERRLA x2, both eyes reddened (IP did state he got sprayed earlier) Swelling noted to left side of jaw. IP states he is unable to open mouth fully or pivot jaw. Denies having any injury inside of mouth. Contusion and abrasion noted above right eyebrow. No raccoon eyes or battle signs noted. Denies having any N/V at this time, but did state he vomited earlier in the day. 1cm laceration to right side upper lip, not actively bleeding, dry blood noted. No bleeding or drainage from inside ears or nose. Multiple abrasion marks to hands elbows, and knees of IP, superficial and not actively bleeding. IP given icepack and applied to swollen jaw. Laceration cleaned with NS.

---

Legend: c=Corrected, @=Abnormal, C=Critical, L=Low, H=High, f=Result Comment, i=Interp Data, *=Performing Lab

Report Request ID:  56281690                             Print Date/Time  6/10/2022 11.17 PDT

**WARNING:** This report contains confidential, proprietary, and/or legally privileged information intended for the recipient only.

* Auth (Verified) *

UCDHS-02          5/9/2022 11:01:58 AM  PAGE  5/027  Fax Server



HOSPITAL                          Fisher*#, Al Jr Gene
2315 Stockton Boulevard          MRN: 7932969, DOB: 11/28/1968, Sex: M
Sacramento CA 95817-2201

---

**05/06/2022 - ED in EMERGENCY - PAVILION (continued)**

**ED Provider Note (continued)**

**Freely ranging his head.**
<u>Cardiovascular</u>:
  Rate and Rhythm: Normal rate and regular rhythm.
  Pulses: Normal pulses.
  Heart sounds: Normal heart sounds.
<u>Pulmonary</u>:
  Effort: Pulmonary effort is normal. No respiratory distress.
  Breath sounds: Normal breath sounds.
  Comments: **No chest wall tenderness to palpation.**
<u>Chest</u>:
  Chest wall: No tenderness.
<u>Abdominal</u>:
  Palpations: Abdomen is soft.
  Tenderness: There is no abdominal tenderness.
  Comments: **No abdominal tenderness to palpation.**
<u>Musculoskeletal</u>:
  General: Normal range of motion.
  Cervical back: Normal range of motion and neck supple.
  Comments: **Right shoulder tenderness to palpation.**
**Right shoulder an right clavicle pain**
<u>Skin</u>:
  General: Skin is warm and dry.
  Comments: **Skin tear over his left and right knee with no bony tenderness.**
**Road rash over right elbow, right wrist and right 5th digit.**
<u>Neurological</u>:
  General: No focal deficit present.
  Mental Status: He is alert and oriented to person, place, and time.
<u>Psychiatric</u>:
  Mood and Affect: Mood normal.
  Behavior: Behavior normal.

**INITIAL ASSESSMENT & PLAN, MEDICAL DECISION MAKING, ED COURSE**
Al Jr Gene Fisher is a 53yr male who presents with a chief complaint of jaw pain.

Differential includes, but is not limited to: Left mandibular fracture right periorbital fracture laceration, intracranial
hemorrhage, conjunctival hemorrhage, retrobulbar hematoma
Amount/Complexity of Data Reviewed
The results of the ED evaluation were notable for the following:

**Pertinent lab results:**
Labs Reviewed
CBC WITH DIFFERENTIAL - Abnormal
  Result              Value
  White Blood Cell Count 12.9 (*)
  Red Blood Cell Count  5.02
  Hemoglobin           15.0

COPY - Protected Health Information - 05/09/2022 10:59:56-
MEDREC0644

Page

SAC

* Auth (Verified) *

UCDHS-02          5/9/2022 11:01:58 AM  PAGE    9/027   Fax Server

# UCDAVIS
HOSPITAL                  Fisher*#, Al,Jr Gene
2315 Stockton Boulevard   MRN: 7932969  DOB: 11/28/1968, Sex M
Sacramento CA 95817-2201

# HEALTH

## 05/06/2022 - ED in EMERGENCY - PAVILION (continued)

ED Provider Note (continued)

**Chart Review:** I reviewed the patient's prior medical records. Pertinent information that is relevant to this encounter. No prior encounters.

**PATIENT SUMMARY:**
This is a 53-year-old incarcerated male victim of assault today with right eye pain and left jaw pain. Vital signs stable on arrival, scattered abrasions but no bony tenderness over upper or lower extremities. Visual acuity 20/40 bilateral uncorrected, patient usually wears glasses but does not have these with him-visual acuity of affected eye is equal to unaffected eye and for this reason doubt acute visual acuity change in affected eye. No discrete fluorescein uptake doubt corneal abrasion but does have right medial subconjunctival hemorrhage. IOP <20 bilaterally and no retrobulbar hemorrhage on CT.

Right lip laceration crossing vermilion border repaired with absorbable suture. Pain well controlled in ED with Tylenol/ibuprofen. Will discharge with conservative pain control measures and follow-up with PCP.

**ED Course** is of 0 \/3 A 1 9 30
Fri May 06, 2022
0540    IOP 14OD 15OS
        Visual acuity: 20/40 OD 20/40 OS (sic)
0034    Creatinine Blood, 0.93 (P )

**ED Course User Index**
(RO Oliver, Si, 1), HS

**LAST VITAL SIGNS:**
Temp: 36.9 °C (98.5 °F) (05/06/22 0249)
Temp src: Oral (05/06/22 0249)
Pulse: 87 (05/06/22 0249)
BP: 132/83 (05/06/22 0249)
Resp: 16 (05/06/22 0357)
SpO2: 99 % (05/06/22 0249)
Weight: (not recorded)

**Clinical Impression:** S/p assault, subconjunctival hemorrhage

**Disposition:** Discharge. Follow up with PCP. ED discharge instructions were reviewed and provided.

**PATIENT'S GENERAL CONDITION:**
COPY - Protected Health Information - 05/09/2022 10:59:56-
MEDREC0644                                                        Page

SAC

# PROOF OF SERVICE

(C.C.P. §§1013(a); 2015.5; 28 U.S.C. §1746)

I, _AL GENE FISHER, JR_, am over the age of eighteen (18) years, and I (am) (am not) a party to the within cause of action. My address is:

_P.O. BOX 1050_
_SOLEDAD, CA._
_93960_

On, _SEPTEMBER 7, 2023_, I served the following documents:

_FIRST AMENDED COMPLAINT_

on the below named individual(s) by depositing true and correct copies thereof in the United State mail in Represa, California, with postage fully prepaid thereon, addressed as follows:

1. _U.S. DISTRICT COURT_
_EASTERN DISTRICT OF CALIFORNIA_
_501 I STR, STE. 4-200_
_SACRAMENTO, CALIF_
_95814-2322_

2. _____
_____
_____
_____

I have read the above statements and declare under the penalty of perjury of the laws of the State of California that the foregoing is true and correct.

Executed this __7__ day of _SEPTEMBER_, _2023_, at California State Prison - Sacramento, Represa, California.

(Signature) _Al Fisher_