AL GENE FISHER, JR. # J-42468
Name and Prisoner/Booking Number

SALINAS VALLEY STATE PRISON
Place of Confinement

P.O. BOX 1050
Mailing Address

SOLEDAD, CA. 93960
City, State, Zip Code

FILED

FEB 05 2024

CLERK, U.S. DISTRICT COURT
EASTERN DISTRICT OF CALIFORNIA
BY ______ DEPUTY CLERK

**(Failure to notify the Court of your change of address may result in dismissal of this action.)**

## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF CALIFORNIA

AL GENE FISHER, JR., (Full Name of Plaintiff)
Plaintiff,

v.

(1) GAYLON, et al., (Full Name of Defendant)
(2) ______
(3) ______
(4) ______
Defendant(s).

☐ Check if there are additional Defendants and attach page 1-A listing them.

CASE NO. 2:22-cv-01952-TLN-JDP
(To be supplied by the Clerk)

**CIVIL RIGHTS COMPLAINT BY A PRISONER**

☐ Original Complaint
☐ First Amended Complaint
☒ Second Amended Complaint

### A. JURISDICTION

1. This Court has jurisdiction over this action pursuant to:
   - ☐ 28 U.S.C. § 1343(a); 42 U.S.C. § 1983
   - ☐ 28 U.S.C. § 1331; Bivens v. Six Unknown Federal Narcotics Agents, 403 U.S. 388 (1971).
   - ☐ Other: ______.

2. Institution/city where violation occurred: CALIFORNIA STATE PRISON/SACRAMENTO.

## B. DEFENDANTS

1. Name of first Defendant: MR. GUERRA. The first Defendant is employed as: CORRECTIONAL OFFICER (Position and Title) at CALIFORNIA STATE PRISON/SACRAMENTO. (Institution)

2. Name of second Defendant: MR. TAPIA. The second Defendant is employed as: CORRECTIONAL OFFICER (Position and Title) at CALIFORNIA STATE PRISON/SACRAMENTO. (Institution)

3. Name of third Defendant: MR. MARTIN. The third Defendant is employed as: CORRECTIONAL OFFICER (Position and Title) at CALIFORNIA STATE PRISON/SACRAMENTO. (Institution)

4. Name of fourth Defendant: MR. [illegible] SCHULTZE. The fourth Defendant is employed as: CORRECTIONAL OFFICER (Position and Title) at CALIFORNIA STATE PRISON/SACRAMENTO (Institution)

**If you name more than four Defendants, answer the questions listed above for each additional Defendant on a separate page.**

## C. PREVIOUS LAWSUITS

1. Have you filed any other lawsuits while you were a prisoner? ☒ Yes ☐ No

2. If yes, how many lawsuits have you filed? ONE. Describe the previous lawsuits:

a. First prior lawsuit:
   1. Parties: AL GENE FISHER v. T. FELKER, et al.,
   2. Court and case number: U.S. DISTRICT COURT EASTERN DISTRICT NO: 2:07-CV-02271-PMP-GWF
   3. Result: (Was the case dismissed? Was it appealed? Is it still pending?) CASE WAS DISMISSED.

b. Second prior lawsuit:
   1. Parties: ______ v. ______
   2. Court and case number: ______.
   3. Result: (Was the case dismissed? Was it appealed? Is it still pending?) ______.

c. Third prior lawsuit:
   1. Parties: ______ v. ______
   2. Court and case number: ______.
   3. Result: (Was the case dismissed? Was it appealed? Is it still pending?) ______.

**If you filed more than three lawsuits, answer the questions listed above for each additional lawsuit on a separate page.**

# B. DEFENDANTS (CONTINUED)

NAME OF FIFTH DEFENDANT LIEUTENANT STIEGELMAIER. THE FIFTH DEFENDANT IS EMPLOYED AS: CORRECTIONAL OFFICER (LIEUTENANT) at CALIFORNIA STATE PRISON/SACRAMENTO.

NAME OF SIXTH DEFENDANT MR. JOSEPH. THE SIXTH DEFENDANT IS EMPLOYED AS: CORRECTIONAL OFFICER at CALIFORNIA STATE PRISON/SACRAMENTO.

NAME OF SEVENTH DEFENDANT MR. KENDALL. THE SEVENTH DEFENDANT IS EMPLOYED AS: CORRECTIONAL OFFICER (SERGEANT) at CALIFORNIA STATE PRISON/SACRAMENTO.

NAME OF EIGTH DEFENDANT A. DIAZ. THE EIGHT DEFENDANT IS EMPLOYED AS: CORRECTIONAL OFFICER at CALIFORNIA STATE PRISON/SACRAMENTO.

NAME OF NINTH DEFENDANT ALEX. THE NINTH DEFENDANT IS EMPLOYED AS: REGISTERED NURSE at CALIFORNIA STATE PRISON/SACRAMENTO.

NAME OF TENTH DEFENDANT C. LARSEN. THE TENTH DEFENDANT IS EMPLOYED AS: CORRECTIONAL OFFICER (SERGEANT) at CALIFORNIA STATE PRISON/SACRAMENTO.

NAME OF ELEVENTH DEFENDANT ANDES. THE ELEVENTH DEFENDANT IS EMPLOYED AS: CORRECTIONAL OFFICER (ASSOCIATE WARDEN) at CALIFORNIA STATE PRISON/SACRAMENTO

## D. CAUSE OF ACTION

### CLAIM I

1. State the constitutional or other federal civil right that was violated: EIGHT AMENDMENT VIOLATION, UNNECESSARY USE OF FORCE (EXCESSIVE).

2. **Claim I.** Identify the issue involved. Check **only one**. State additional issues in separate claims.

☐ Basic necessities ☐ Mail ☐ Access to the court ☐ Medical care
☐ Disciplinary proceedings ☐ Property ☐ Exercise of religion ☐ Retaliation
☒ Excessive force by an officer ☐ Threat to safety ☐ Other: ____________.

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Claim I. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

ON MAY 5, 2022 OFFICERS MARTIN, GUERRA, SCHULTZE, AND TAPIA ALL USED UNNECESSARY USE OF FORCE BY DEPLOYING AN OUTRAGEOUS AMOUNT OF CHEMICAL WEAPONS INSTEAD OF PHYSICALLY INTERVENING THE ATTACK DEFENDANT SUFFERED BY INMATE JETTON C.D.C.R. # F-64512. NAMED OFFICER'S SPRAYED ME IN THE FACE WITH MK9 OC STREAMER AS WELL AS DEPLOYING (7) BLAST GRENADES AT US CAUSING ME TO HAVE A BAD ASTHMA REACTION. SUCH REACTION AND USE OF SO MANY CHEMICAL WEAPONS IS UNNECESSARY AND EXCESSIVE FOR JUST A MUTUAL COMBAT WITHOUT NO WEAPONS BEING USED BY INMATES.

(PLEASE SEE EXHIBIT (A)).

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).
I SUFFERED A BAD ASTHMA REACTION DUE TOO CHEMICALS USED.

5. **Administrative Remedies:**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution? ☒ Yes ☐ No
   b. Did you submit a request for administrative relief on Claim I? ☒ Yes ☐ No
   c. Did you appeal your request for relief on Claim I to the highest level? ☒ Yes ☐ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. ____________.

## CLAIM II

1. State the constitutional or other federal civil right that was violated: [redacted] AND FOURTEENTH AMENDMENT VIOLATION OF DUE PROCESS.

2. **Claim II.** Identify the issue involved. Check **only one**. State additional issues in separate claims.
   - ☐ Basic necessities ☐ Mail ☐ Access to the court ☐ Medical care
   - ☐ Disciplinary proceedings ☐ Property ☐ Exercise of religion ☐ Retaliation
   - ☐ Excessive force by an officer ☐ Threat to safety ☒ Other: HARDSHIP/PUNISHMENT.

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Claim II. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

DEFENDANTS LARSEN, LIEUTENANT STIGELMAYER, AND ASSOCIATE WARDEN ANDES ALL VIOLATED MY FOURTEENTH AMENDMENT RIGHT TO DUE PROCESS BY ORDERING ME PLACED IN A HOLDING CELL WITH STANDING ROOM ONLY AND NO USE OF TOILET FACILITIES, HANDCUFFED, AND REFUSED ME MEDICAL ATTENTION BEYOND PRISON POLICY OF (4) HOURS, BUT INSTEAD HELD IN HOLDING CELL WITH SERIOUS MEDICAL NEEDS FOR (11) HOURS AND (52) MINUTES. LIEUTENANT STIGELMAYER AND ASSOCIATE WARDEN LIED ABOUT REASON'S OF EXTENDED PLACEMENT AND DENIAL OF MEDICAL CARE. (PLEASE SEE EXHIBIT ATTACHED). I CONSISTENTLY COMPLAINED TOO OFFICERS A. DIAZ, JOSEPH, KENDALL, AND ANOTHER UNNAMED OFFICER OF PAIN WHILE LOCKED IN HOLDING CAGE BUT WAS IGNORED BY THESE OFFICER'S AS WELL DENIED USE OF TOILET BY OFFICERS JOSEPH AND DIAZ FOR HOURS! THESE OFFICERS DENIED ME A LIBERTY INTEREST AND SUBJECTED ME TO TREATMENT OR CONDITIONS THAT ARE ATYPICAL AND SIGNIFICANT HARDSHIP IN RELATION TO ORDINARY INCIDENTS OF PRISON LIFE WITHOUT DUE PROCESS PER PRISON POLICY. DEFENDANT KENDALL (SERGEANT) ALSO VIOLATED MY 14TH AMENDMENT RIGHT AS WELL BY ORDERING ME PLACED IN HOLDING WITH NO LEGITIMATE DUE PROCESS. (PLEASE SEE EXHIBIT (B)).

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).

I SUFFERED ASTHMA ATTACK'S, AS WELL AS PAIN IN JAW, HEAD AREA FOR HOURS, AND PAIN IN LIP DUE TOO LACERATION THAT NEEDED STITCHES THAT WAS IGNORED FOR OVER (11) HOURS BY NAMED OFFICERS.

5. **Administrative Remedies.**
   a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution? ☒ Yes ☐ No
   b. Did you submit a request for administrative relief on Claim II? ☒ Yes ☐ No
   c. Did you appeal your request for relief on Claim II to the highest level? ☒ Yes ☐ No
   d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. ______

**CLAIM III**

1. State the constitutional or other federal civil right that was violated: EIGHT AMENDMENT VIOLATION DELIBERATE INDIFFERENCE.

2. **Claim III.** Identify the issue involved. Check **only one**. State additional issues in separate claims.

- ☐ Basic necessities ☐ Mail ☐ Access to the court ☒ Medical care
- ☐ Disciplinary proceedings ☐ Property ☐ Exercise of religion ☐ Retaliation
- ☐ Excessive force by an officer ☐ Threat to safety ☐ Other: ______.

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Claim III. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

LIEUTENANT STIGELMAYER AND REGISTERED NURSE SHOWED DELIBERATE INDIFFERENCE BY DENYING ME MEDICAL TREATMENT FOR OVER (11) HOURS WHILE LOCKED IN A HOLDING CAGE HANDCUFFED WITH STANDING ROOM ONLY.

REGISTERED NURSE ALEX LIED AND FALSIFIED MEDICAL REPORT ON MAY 5, 2022 AFTER PLANTIFF WAS ASSAULTED, BY NOT REPORTING INJURY (LACERATION TO UPPER LIP THAT NEEDED SUTURES) AND COMPLAINTS OF PROBLEMS OF BREATHING AND ASTHMA AND CLEARED ME TO BE HELD IN A HOLDING CELL HANDCUFFED, WITH STANDING ROOM ONLY THAT I WAS EVENTUALLY HELD IN PAIN OVER (11) HOURS. SHE ALSO IGNORED AND DID NOT ADVOCATE FOR PLANTIFF TO BE TAKEN TO T.T.A. (PRISON HOSPITAL) AFTER MEDICAL STAFF CONTACTED STAFF ON THAT FACILITY I WAS HELD AT. (PLEASE SEE EXHIBIT) LIEUTENANT STIGELMAYER ALSO SHOWED DELIBERATE INDIFFERENCE AND DENIED ME MEDICAL CARE FOR MY ASTHMA AND OTHER INJURIES AFTER BEING NOTIFIED BY MEDICAL STAFF NUMEROUS TIMES TO TRANSFER ME TO T.T.A. (PRISON HOSPITAL) BUT YET CHOSE TO HOLD ME IN HOLDING CAGE FOR OVER (11) HOUR'S IN PAIN. AND NOT TAKING ME TO HOSPITAL. (PLEASE SEE EXHIBIT) (B.).

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).

SUFFERED ASTHMA ATTACK, AND SUFFERED UNBEARABLE PAIN FOR OVER (11) HOURS DUE TOO INACTIONS OF DEFENDANTS. ALSO SUFFERED LIFELONG SCAR ON UPPER LIP AND CHIPPED FRONT TOOTH, AND NEEDED SUTURES [redacted] ON UPPER LIP ON MAY 5, 2022.

5. **Administrative Remedies.**

a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution? ☒ Yes ☐ No

b. Did you submit a request for administrative relief on Claim III? ☒ Yes ☐ No

c. Did you appeal your request for relief on Claim III to the highest level? ☒ Yes ☐ No

d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. ______.

**If you assert more than three Claims, answer the questions listed above for each additional Claim on a separate page.**

## D. CAUSE OF ACTION

### CLAIM IV

1. State the constitutional or other federal civil right that was violated: EIGHT AMENDMENT VIOLATION

2. **Claim I.** Identify the issue involved. Check **only one**. State additional issues in separate claims.

- ☐ Basic necessities
- ☐ Mail
- ☐ Access to the court
- ☐ Medical care
- ☐ Disciplinary proceedings
- ☐ Property
- ☐ Exercise of religion
- ☐ Retaliation
- ☒ Excessive force by an officer
- ☐ Threat to safety
- ☐ Other: ______

3. **Supporting Facts.** State as briefly as possible the FACTS supporting Claim I. Describe exactly what **each Defendant** did or did not do that violated your rights. State the facts clearly in your own words without citing legal authority or arguments.

LIEUTENANT STIGELMAYER, SERGEANT LARSEN SUBJECTED ME TO EXCESSIVE FORCE AS WELL AS ASSOCIATE WARDEN ANDES BY ORDERING ME PLACED IN A HOLDING CELL HANDCUFFED, WITH STANDING ROOM ONLY WITHOUT MEDICAL CARE THAT WAS NEEDED AFTER AN ASSAULT BY ANOTHER INMATE WHICH PLANTIFF SUSTAINED SERIOUS INJURIES (PLEASE SEE EXHIBIT (B)), FOR (11) HOURS AND (0) MINUTES FOR NO PENALOGICAL REASON. PLANTIFF WAS DENIED USE OF TOILET AND DEFENDANTS LIED AND FALSIFIED REPORTS AS TOO THIS EXCESSIVE FORCE. (AGAIN PLEASE SEE EXHIBIT (B).)

4. **Injury.** State how you were injured by the actions or inactions of the Defendant(s).

I HAD TO SUFFER PAIN ALL THOSE HOURS LOCKED IN THAT CAGE, I HAVE A SCAR ON UPPER LIP AND CHIPPED FRONT TOOTH FOR LIFE AND HIP, BACK, AND SHOULDER PAIN.

5. **Administrative Remedies:**

a. Are there any administrative remedies (grievance procedures or administrative appeals) available at your institution? ☒ Yes ☐ No

b. Did you submit a request for administrative relief on Claim I? ☒ Yes ☐ No

c. Did you appeal your request for relief on Claim I to the highest level? ☒ Yes ☐ No

d. If you did not submit or appeal a request for administrative relief at any level, briefly explain why you did not. ______

## E. REQUEST FOR RELIEF

State the relief you are seeking: I'M SEEKING COMPENSATORY DAMAGE OF $500,000 AND PUNITIVE DAMAGES OF $100,000 AGAINST EACH DEFENDANT. THE $500,000 AGAINST DEFENDANTS EITHER JOINTLY OR SEVERALLY FOR THE PHYSICAL INJURIES PLAINTIFF SUFFERED AND STILL SUFFER FROM FOR LIFE.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on FEBURARY 1, 2024
DATE

Al Fisher
SIGNATURE OF PLAINTIFF

N/A
(Name and title of paralegal, legal assistant, or other person who helped prepare this complaint)

N/A
(Signature of attorney, if any)

N/A
(Attorney's address & telephone number)

## ADDITIONAL PAGES

All questions must be answered concisely in the proper space on the form. If you need more space you may attach more pages, but you are strongly encouraged to limit your complaint to twenty-five pages. If you attach additional pages, be sure to identify which section of the complaint is being continued and number all pages. Remember, there is no need to attach exhibits to your complaint.

# EXHIBIT



**STAFF NARRATIVE**

**STAFF NAME:** Martin
**CREATED DATE:** 05/05/2022

**NARRATIVE TYPE:** Initial Report
**CREATED TIME:** 21:10:56

**NARRATIVE**

On Thursday, May 5, 2022 at approximately 1248 hours, while working my assigned post as A Yard 3, I was monitoring the main yard and observed two inmates later identified by their state issued identification cards as Inmates JETTON (F64512, FA3-131L), and FISHER (J42468, FA6-228U) striking each other with both fists in the head and upper torso areas. Officer T. Guerra notified A Facility Observation to put the yard down and notified central control via institutional radio of a 1 on 1 fight on the upper track near the hand ball court on A Facility. A-facility observation announced via the public address system for all inmates on the yard to get down. All inmates complied with the exception of JETTON and FISHER as they continued to fight. As I responded to the incident. Yard staff including myself established the skirmish line. JETTON and FISHER managed to make their way onto the handball court. Both inmates fell to the ground with JETTON straddling FISHER, both inmates continued to strike each other with closed fists to their upper torso and facial area. I ordered both inmates to get down with negative results, as they continued to fight each other. In order to gain compliance with a lawful order, and subdue their ongoing attack of each other, I deployed one (1) 1040 Chlorobenzylidene Malonontrile (CS) instantaneous blast grenade (IBG) from approximately 12 feet away utilizing an underhand toss, aiming towards the ground next to the fighting inmates. The IBG detonated approximately 3 feet away from the inmates, the use of force yielded negative results as they continued to fight. Responding staff continued to give orders for both inmates to get down. JETTON and FISHER ignored all orders and continued to fight. I observed multiple IBG's being deployed from responding staff. The IBG's detonated approximately 1-2 feet away from the JETTON and FISHER. Due to my focus on JETTON and FISHER I was unable to determine the distance at which they were deployed or who deployed them or the method utilized in deploying them. I ordered both inmates to get down with negative results as they continued to fight. I deployed one 1040 Oleoresin Capsicum (OC) IBG from approximately 10 feet away utilizing an underhand toss, aiming towards the ground next to both inmates. The IBG detonated approximately 2 feet away from both inmates. The combined use of force yielded negative results as both inmates continued to fight. The skirmish line advanced forward, I ordered both inmates to get down with negative results as both inmates still continued to strike each other in the face. I administered one approximate 2 second burst of OC pepper spray from approximately 6 feet away, aiming toward FISHER's facial area. The OC made contact with my intended target. I then continued to order both inmates to get down, with negative results. I Administered a second approximate 2 second burst of OC pepper spray from approximately 6 feet away aiming towards JETTON's facial area, making contact with my intended target. The use of force yielded positive results as both inmates separated and assumed a prone position on the ground. Cover/ contact teams were assigned. Officer Guerra placed JETTON into handcuffs, performed a clothed body search yielding negative results for contraband. We assisted JETTON to his feet and escorted him to the A Facility Pedestrian Sally port. Officer Guerra placed JETTON into Temporary holding cell 4 Officer Guerra performed an unclothed body search yielding negative results for contraband. JETTON was escorted to the decontamination shower where he was afforded copious amounts of cool running water for further decontamination. Once satisfied, JETTON was then placed back into THC 4. JETTON was offered clean clothing to which he accepted. This concludes my involvement in this incident.

D. Martin
STAFF SIGNATURE

**DATE:** 05/05/2022

**BADGE #**

**PERNR:**

**NARRATIVE REVIEWED:** Yes
**REVIEWED DATE:** 05/05/2022

**REVIEWED BY STAFF:** Larsen,
**REVIEWED TIME:** 21:31:46

**STAFF NARRATIVE**

**STAFF NAME:** Schultz
**CREATED DATE:** 05/05/2022

**NARRATIVE TYPE:** Initial Report
**CREATED TIME:** 19:59:40

**NARRATIVE**

On Thursday, May 5, 2022 at approximately 1248 hours, while performing my duties as A Yard 2, I observed two inmates, later identified by their state issued identification cards as JETTON (F64512, FA6-131L) and FISHER (J42468, FA6-228U) engaged in a fight. Both inmates were striking each other in the face and upper torso with their fists. I and the yard officers responded to the incident location on the hard track near the metal tables by A facility 4 block. As we neared the incident we gave verbal orders to the inmates to "get down" and "stop fighting", having negative results as both inmates continued to strike each other in the facial area. As the inmates continued to fight they fell to the ground but continued to strike each other in the facial area. One instantaneous blast grenade (IBG) detonated on the ground approximately five feet from the fighting inmates with negative results as they continued to strike each other in the facial area. Due to my focus on the fighting inmates, I was not able to identify which officer deployed the grenade, nor the type of IBG utilized or the deployment method used. Responding staff formed a skirmish line on the hard track and continued to give verbal orders to the fighting inmates to "get down" and "stop fighting", with negative results as they continued to strike each other in the facial area. Officer D. Martin deployed an IBG utilizing an underhand toss from approximately 15 feet away, which landed and detonated approximately 3 feet from the combatants having negative results as the inmates continued to strike each other in the facial area. Due to my focus on the fighting inmates I was unable to positively identify the type of IBG utilized. As the combatants continued to fight, to gain compliance with a lawful order and subdue the attackers and with the imminent threat of serious bodily injury, I deployed one instantaneous blast OC grenade utilizing an underhand toss from approximately 15 feet away aiming at the ground in front of the inmates. The IBG landed and detonated on the ground approximately two feet from the fighting inmates having negative results as the inmates continued to strike each other in the facial area. As the inmates continued to strike each other and not comply with direct orders, simultaneously two IBG's landed and detonated approximately one foot from the fighting inmates having negative results as the inmates continued to strike each other in the facial area. Due to my focus on the combatants I was not able to identify which officers deployed the grenades, nor the type of IBG's utilized or the deployment method's used. The combatants continued to fight, to gain compliance with a lawful order and subdue the attackers and with the imminent threat of serious bodily injury occurring, I deployed one instantaneous blast CS grenade utilizing an underhand toss from approximately 15 feet away aiming at the ground in front of the inmates. The IBG landed and detonated on the ground approximately one foot from the combatants having negative results as the inmates continued to strike each other in the facial area. The fighting inmates continued striking each other and Officer Martin moved closer with the skirmish line to the combatants and deployed two approximately two second bursts of his state issued MK-9 high volume streamer OC pepper spray from approximately 6 feet away striking each inmate in the facial area. This OC pepper spray had positive effects as the combatant's separated and took a prone position on the ground. Cover/contact teams were assigned and restrained the combatants and escorted them from the yard. This concludes my involvement with this incident.

J. Schultze

STAFF SIGNATURE

**DATE:** 05/05/2022

**BADGE**

**PERN**

**NARRATIVE REVIEWED:** Yes
**REVIEWED DATE:** 05/05/2022

**REVIEWED BY STAFF:** Larsen
**REVIEWED TIME:** 20:10:04

**STAFF NARRATIVE**

**STAFF NAME:** Guerra,
**CREATED DATE:** 05/05/2022

**NARRATIVE TYPE:** Initial Report
**CREATED TIME:** 18:55:19

**NARRATIVE**

On Thursday, May 5, 2022, at approximately 1248 hours, I was performing my duties as A Facility Yard Officer #1 (Post# 222021). While observing the yard from the upper sally port area I observed Inmate JETTON (F64512/FA6-131L) and Inmate FISHER (J42468/FA6-228U) engaged in combat. Both inmates were identified via the Strategic Offenders Management System (SOMS). Inmate JETTON and Inmate FISHER were utilizing both fists and striking each other in the head and upper torso area. Via my Institutional Radio, I summoned a Code 1 response for a 1 on 1 fight near the upper handball court. Observation gave a direct order of "Down on the Yard" using the Public Address System (PA). The lawful order had negative results on the combative inmates as they continued fighting. I immediately responded to the incident. Multiple lawful orders to "get down" from responding staff were ignored by both inmates. At this time, I observed Officer D. Martin underhand toss a CS Instantaneous Blast Grenade (IBG) from approximately 15 feet away. The IBG detonated approximately 3 feet from the feet of the combative inmates yielding a negative effect on subduing the attacks by both inmates. A skirmish line was being formed on the hard track near the incident. At this time I moved an uninvolved inmate off the hard track and away from the skirmish line. As I relocated the incident, multiple IBG's deployed near the combative inmates. Due to my focus on moving the uninvolved inmate, I was unable to determine the distance, the methodology, nor the origin of the IBG's. The grenades had a negative effect on subduing the continued attacks by both inmates. Multiple direct orders continued to be ignored by the combative inmates as the fight transitioned to the ground. In order to gain compliance with a lawful order, subdue the attackers, and effect custody I underhand tossed an OC Instantaneous Blast Grenade from approximately 15 feet away aiming at the right foot of Inmate JETTON. The grenade detonated approximately 1 foot from the combative inmates. Multiple IBG's detonated near the fighting inmates at approximately the same time. Due to my focus on my IBG, I was unable to determine the distance, the methodology, nor the origin the IBG's were deployed. All IBG's had a negative effect, and the inmates continued striking each other. I transitioned to my MK9 Pepper spray and assessed the combative inmates. I gave Inmate JETTON a direct order to stand up and distance himself from Inmate FISHER because he was on top; however, both inmates remained engaged in combat. Inmate FISHER was actively striking from the ground and Inmate JETTON was actively striking from a top position. At this time I observed Officer MARTIN utilize his MK9 OC Pepper Spray from approximately 6 feet away. Martin used 2 consecutive bursts of spray. Each burst of spray was approximately 2 second in length. The spray struck the face and upper torso area of both inmates yielding in a positive effect to subdue both attackers. Both inmates separated and assumed a prone position; cover/contact teams were utilized to secure the involved inmates. Inmate FISHER was secured without incident and escorted to the A Pedestrian Sally Port. At this time I secured Inmate JETTON in mechanical restraints and performed a clothed body search with negative results for contraband. I assisted Inmate JETTON to a standing position and proceeded to escort him to the A Facility Pedestrian Sally Port, Holding Cell #7. I conducted a search of holding before placing JETTON inside which yielded negative results for contraband. I conducted an unclothed body search on Inmate JETTON with negative results for contraband. Medical staff performed a CDCR 7219 medical evaluation on Inmate JETTON. At this time I offered GREEN fresh clothes and a decontamination shower. JETTON accepted both. I escorted JETTON to the decontamination shower where he was allowed to decontaminate with copious amounts of cool, to the touch, running water. I conducted a search of the decontamination shower before allowing JETTON to enter with negative results for contraband. JETTON alerted me when he finished decontamination. I escorted JETTON back to holding cell #7. Prior to placing JETTON back into holding cell #7, I conducted another search of the holding cell with negative results for contraband. A clean state issue white T-shirt, as well as a clean pair of boxers was afforded to Inmate JETTON. This concludes my involvement in the incident.

T. Guerra
STAFF SIGNATURE

**DATE:** 05/05/2022

**BADGE**

**PERNR**

**NARRATIVE REVIEWED:** Yes
**REVIEWED DATE:** 05/05/2022

**REVIEWED BY STAFF:** Larsen,
**REVIEWED TIME:** 19:41:42

**CDCR**
**REPORT NO. IRTR161 - 12**

**INCIDENT REPORT PACKAGE**

**INCIDENT LOG NUMBER: 000000000038394**

**PAGE:** 30
**PROCESSED:** 06/03/2022 07:35
**REQUESTOR:** L. Bales

**STAFF NARRATIVE**

**STAFF NAME:** Tapia, C
**CREATED DATE:** 05/05/2022

**NARRATIVE TYPE:** Initial Report
**CREATED TIME:** 17:17:33

**NARRATIVE**

On Thursday, May 5, 2022 at approximately 1248 hours, while performing my duties as A Yard Officer 4 Post # 222024. I saw two inmates fighting each other on the upper hand ball court on A facility main yard, who were later identified by state issued Identification cards (ID) as INMATE FISHER (J42468, FA6-228) and INMATE JETTON (F64512, FA6-131). FISHER and JETTON were striking each other with their fist in the upper torso and face. Institutional radio call was made and A Observation put the yard down. The yard got down but FISHER and JETTON continued fighting. The Yard Officers and myself responded to the incident creating a skirmish line and gave both inmates multiple orders to get down, to which they did not comply. I immediately gave the inmates a direct order to get down with negative results. To gain compliance with a lawful order and subdue an attacker. I deployed an Instantaneous Blast Grenade (IBG) with an under hand toss, from approximately 10 feet away, aiming 3 feet away from the fight, the IBG landed approximately 3 feet away and was not effective. Simultaneously, I observed multiple IBG's detonate near the fight. Due to my position on the skirmish line and focus on the fight, I was unable to identify who deployed the IBG's, from what distance they were deployed, and the method they used to toss the IBG's. The combine use of force was not effective and the inmates continued striking each other in the upper torso. Once the IBG's detonated, I continued to give multiple direct orders to stop fighting with negative results. I deployed a second IBG with an under hand toss, from approximately 10 feet away, aiming 3 feet away from the fight, the IBG landed approximately 2 feet away from the fight, and was not effective. Simultaneously, I observed multiple IBG's detonate on the ground near the fight. Due to my position on the skirmish line and focus on the fight, I was unable to identify who deployed the IBG's, from what distance they were deployed, and the method they utilized to toss the IBG's. The combined use of force was still not effective. I then observed Officer D. Martin utilize his MK 9 OC Pepper Spray and deploy an approximate 2 second burst, from approximately 6 feet away, striking FISHER in his facial area. I observed Officer D. Martin utilize his MK 9 OC Pepper Spray again and deploy an approximate 2 second burst, from approximately 6 feet away, striking JETTON in his facial area. The OC Pepper Spray had a positive effect on both inmates, as they both got down in a prone position. More responding staff arrived to support the skirmish line. Cover and contact staff were assigned. I approached inmate FISHER and placed him in restraints. I then conducted a clothed body search and obtained negative results. I then escorted inmate FISHER down to the A Pedestrian Sally Port where a medical evaluation was documented on a CDCR 7219 and medical provided inmate FISHER with his inhaler due to trouble breathing. Prior to placing FISHER in to holding cell #3, I conducted a visual inspection of the holding cell, which yielded negative results for contraband, and placed FISHER into holding cell # 3. I then proceed with an unclothed body search, which yielded negative results for contraband. I offered FISHER a decontamination shower which he accepted. I placed FISHER in restraints and moved FISHER to the decontamination holding cell, where I provided inmate FISHER with cool running water for approximately 2 minutes. After FISHER was decontaminated, I provided FISHER with clean clothing, placed him into handcuffs, removed him from the decontamination holding cell, and escorted him back to holding cell # 3. This concludes my involvement in this incident.

C. Tapia
STAFF SIGNATURE

**DATE:** 05/05/2022

**BADGE #:**

**PERNR:**

**NARRATIVE REVIEWED:** Yes
**REVIEWED DATE:** 05/05/2022

**REVIEWED BY STAFF:** Larsen,
**REVIEWED TIME:** 19:42:01

# EXHIBIT

EXHIBIT: (B)




101 Mission Street, Sixth Floor
San Francisco, California 94105-1738
T: (415) 433-6830 • F: (415) 433-7104
www.rbgg.com

Jessica Winter
Email: jwinter@rbgg.com

October 24, 2022

<u>VIA ELECTRONIC MAIL ONLY</u>

**PRIVILEGED AND CONFIDENTIAL**

**SUBJECT TO PROTECTIVE ORDERS**





CDCR Office of Legal Affairs

Re: *Coleman v. Newsom*: Retaliation and Harassment of Al Gene Fisher, J42468, at SAC
<u>Our File No. 0489-3</u>

Dear Office of Legal Affairs:

We write on behalf of *Coleman* class member Al Gene Fisher, J42468, a CCCMS patient housed at California State Prison, Sacramento (SAC).

Mr. Fisher has faced a series of retaliatory incidents from SAC officers starting immediately after September 9, 2021, when he participated in a confidential phone call with *Coleman* class counsel. The retaliation escalated rapidly after November 24, 2021, when counsel provided CDCR Mr. Fisher's witness declaration in *Coleman* reporting an incident of staff using excessive force against a different class member at SAC. Since submitting the declaration, SAC officers have issued Mr. Fisher discriminatory Rule Violation Reports (RVRs), denied him showers, and taunted Mr. Fisher by calling him a snitch, child molester, weirdo, and other similar terms. Custody officers have directly threatened to assault Mr. Fisher.

Mr. Fisher was assaulted in May 2022. After the assault, custody officers placed Mr. Fisher in a holding cage for approximately 11 hours, without reasonable justification notwithstanding his repeated requests for medical help and medical staff's attempts to evaluate and treat his injuries.

We have identified several witnesses to the misconduct Mr. Fisher experienced. But due to these witnesses' fear of retaliation by SAC custody staff, we do not identify them or discuss any specific information from those witnesses in this letter. We have flagged herein where we have received corroborating witness testimony.

The hostile environment SAC officers have created for Mr. Fisher has impacted his mental health. He is living in a state of constant fear and anxiety, which has prevented him from receiving the mental health treatment he needs. He also asked to be moved to the CCCMS level of care, notwithstanding his need for additional mental health treatment, to allow him to escape the hostility of the officers in the EOP unit where he previously lived. He should not have been forced to make this choice. Predictably, Mr. Fisher quickly decompensated in the CCCMS setting, and recently was referred to a crisis bed. In any event, he found no relief from the harassment by moving out of the EOP unit. If anything it has gotten worse.

CDCR must investigate all officers responsible for creating this hostile environment, as described below. More immediately, we request that CDCR transfer Mr. Fisher to an EOP program outside of SAC so that he may receive mental health treatment and stop living in constant fear.

## I. Mr. Fisher Has Experienced Targeted and Systematic Retaliation Since Submitting a Declaration Describing How He Witnessed Staff Use Excessive Force Against Another SAC Resident.

Mr. Fisher's witness declaration in *Coleman* involved an incident of staff using force against *Coleman* class member [redacted], at SAC on Facility B, Building 1. Mr. Fisher and [redacted] both arrived at SAC on June 28, 2021 and were housed in B-1, two cells away from each other. On July 18, 2021, Mr. Fisher and [redacted] began a hunger strike because they were not receiving programming. That evening, about 8 correctional officers went to [redacted] cell and ordered [redacted] to "cuff up" so they could search his cell. [redacted] and the officers began to argue. Mr. Fisher saw that [redacted] eventually complied and was cuffed. Once cuffed, Sergeant [redacted] and CO [redacted] pulled [redacted] out of the cell and threw him onto the floor where many officers hit and kicked him. Following the incident, Mr. Fisher experienced retaliation for participating in an interview regarding what he witnessed.

**A. Officers Intentionally Spread Misinformation About Mr. Fisher's Alleged IEX Behavior and Targeted Mr. Fisher for Seeking Administrative Relief Related to that Misconduct.**

Officers' campaign of retaliation against Mr. Fisher began even before Plaintiffs' counsel shared his declaration with CDCR. In September 2021, after Mr. Fisher spoke with Plaintiffs' counsel regarding the July 18, 2021 incident with [REDACTED], CO [REDACTED] made a derogatory comment about his communication with Plaintiffs' counsel and denied him the use of the phone, and access to showers and mental health groups. Then after we shared the declaration on November 24, 2021, the retaliation escalated. At this point he was housed at SAC on Facility A, Building 6. Since the end of 2021, officers' retaliatory behavior against Mr. Fisher has included falsely accusing Mr. Fisher of sexual misconduct and spreading false and inciting information about Mr. Fisher to the incarcerated population.

On January 9, 2022, while Mr. Fisher was housed in A-6, CO [REDACTED] publicly and verbally harassed Mr. Fisher regarding alleged IEX behavior that did not occur.

During 9:00 pm count, CO [REDACTED] approached Mr. Fisher's cell, 122, on the lower tier and asked him, "What the fuck you doing weirdo?" When Mr. Fisher asked what he meant, CO [REDACTED] turned and walked down the tier, loudly accusing Mr. Fisher of being a sex offender. As CO [REDACTED] conducted count on the top tier, Mr. Fisher heard CO [REDACTED] telling an incarcerated person "We got a weirdo downstairs in 122. I think he need to get done like that dude in 7-Block." CO [REDACTED] was referring to an incarcerated person convicted of a sex offense who was killed in SAC's A-7 housing unit just one day earlier.[1]

Through the crack in his door, Mr. Fisher then saw CO [REDACTED] stop in front of another person's cell door. Mr. Fisher heard CO [REDACTED] state, "Watch out for that weirdo in cell 122. He's fucking jacking off to Ms. G." CO [REDACTED] was referring to CO [REDACTED], who worked in the tower that day. Despite an officer loudly alleging that Mr. Fisher was engaging in sexual misconduct, Mr. Fisher never received an RVR for the purported behavior. CO [REDACTED]'s IEX allegation was false and merely an attempt to incite other incarcerated people against Mr. Fisher.

Within the next few days, Mr. Fisher received an anonymous note slipped under his cell door that stated CO [REDACTED] and CO [REDACTED] were telling other incarcerated

[1] *See* https://www.cdcr.ca.gov/news/2022/01/10/california-state-prison-sacramento-officials-launch-investigation-into-the-death-of-an-incarcerated-person-as-a-homicide/.

people that Mr. Fisher is a sex offender and that he "needs to go." Mr. Fisher completed a 602-1 regarding the January 9, 2022 incident and attached the note as evidence. At the time, Mr. Fisher's unit was on quarantine, so he could not put the grievance in the locked box in the rotunda. Instead, he handed it directly to an officer collecting mail. To this day, Mr. Fisher has not received a grievance log number or any acknowledgment that the institution received this complaint. The anonymous note disappeared with the complaint.

On January 11, 2022, while CO [redacted] conducted 4:00 pm count, Mr. Fisher told CO [redacted] that he heard what CO [redacted] had said on January 9. CO [redacted] then yelled, "I'll tell the whole tier you be in there jacking off to all the females, you fucking weirdo." CO [redacted] then continued conducting count. We have received corroborating reports regarding this incident, but the individuals are so afraid of retaliation by custody staff they that have not allowed us to use their names in this advocacy.

On January 14, 2022, multiple correctional officers searched Mr. Fisher's cell and harassed him while taking and destroying some of his personal property. Among the officers present were CO [redacted], CO [redacted], Lieutenant [redacted], Sergeant [redacted], and Sergeant [redacted]. The officers stated the search was random. During the search, Mr. Fisher stood on the tier in front of his cell. CO [redacted] also stood on the tier, and in front of Lieutenant [redacted] and Sergeants [redacted] and [redacted] stated something to the effect of, "If you want to play the game, we will play the game. This is what snitches get." Mr. Fisher reports that the lieutenant, two sergeants, and CO [redacted] heard, but did not respond to CO [redacted]'s threat.

During the search, officers tore photographs of Mr. Fisher's family and his father's obituary off of his cell wall and left them on the floor. Officers also tossed his toiletries and open food on the ground so his pictures and papers were ruined by shampoo, lotion, and food. The officers also confiscated Mr. Fisher's headphones.

To address custody officers' ongoing harassment and retaliation, Mr. Fisher filed a second grievance on January 27, 2022. *See* **Exhibit A**, January 27, 2022 602-1 Log # 216866. After filing the 602, officers doubled down on their harassing behavior.

On or around January 29, 2022, ISU interviewed Mr. Fisher regarding his January 27th 602. When he returned to A-6 after the interview, Mr. Fisher heard CO [redacted] in the control booth say, "fucking snitch," as he entered the building.

Around this time, Mr. Fisher reports that CO [redacted] again began denying him showers and phone calls. When CO [redacted] worked in the control booth during second watch, Mr. Fisher often was not released from his cell for phone calls or showers.

Mr. Fisher was denied these privileges two to three times per week. We have corroborating reports regarding this misconduct, including that Mr. Fisher could be heard kicking his cell door and yelling to be released for showers, but was repeatedly denied. Out of concern that they could be subject to retaliation, we do not identify witnesses here.

Mr. Fisher's attempt to address staff misconduct also led to threats of physical violence by CO [redacted]. On February 25, 2022 around 12:30pm, Mr. Fisher was released for his phone time. Mr. Fisher approached CO [redacted] in the control booth and asked about his missing phone and shower time. Mr. Fisher reports that CO [redacted] responded in a derogatory and offensive fashion. Mr. Fisher became frustrated and argued back. Then, CO [redacted] said that if Mr. Fisher kept complaining, he would beat Mr. Fisher up and charge him with battery, like he had with another incarcerated person. We have corroborating reports regarding this misconduct, but do not include witness names here due to their fear of retaliation.

To address CO [redacted]'s harassment, Mr. Fisher filed a third grievance on February 25, 2022. *See* **Exhibit B**, February 25, 2022 602-A Log # 228391

During this time, Mr. Fisher repeatedly reported to his clinician that he was being targeted by a specific custody officer. On March 28, 2022, Mr. Fisher reported "feeling 'angry' and upset with a current custody officer in his block. [Mr. Fisher] identified feeling tired of being targeted by this officer," and adamantly requested to speak with the Program Supervisor about his options to stop the harassment, such as moving housing. *See* **Exhibit C**, March 28, 2022 MHPC Progress Note. On April 8, 2022, Mr. Fisher again reported to his clinician feeling "targeted by a particular block officer" and requested to speak with the Program Supervisor. *See* **Exhibit D**, April 8, 2020 MHPC Progress Note.

Around this time, Mr. Fisher's mental health began to decline. He reports that he often declined dayroom so he could avoid interacting with custody officers. He struggled to sleep and eat, and experienced paranoia and hypervigilance. He experienced these mental health symptoms due to the unrelenting harassment by SAC officers.

### B. Officers at SAC Continued to Harass Mr. Fisher and on April 20, 2022 Issued Him a False and Retaliatory RVR.

As a result of Mr. Fisher's first attempt to address staff harassment and retaliation through the administrative remedy process, SAC custody staff continued to harass Mr. Fisher and issued him a false RVR.

On April 20, 2022, CO ███ accused Mr. Fisher of IEX and issued him an RVR. Mr. Fisher was standing at his cell door waiting for pill call when an officer came to his door and instructed him to cuff up because CO ███ had seen him "stroking his penis." *See* **Exhibit E,** May 9, 2022 602 Log # 255170. As Mr. Fisher explained to a sergeant at the time, CO ███ could not have and did not observe Mr. Fisher exposing himself. CO ███ agreed, reporting that Mr. Fisher's "[cell] door [was] blocking his lower body area." *See* **Exhibit F**, RVR Log # 7176935.

Mr. Fisher was charged with "Sexual Disorderly Conduct" pursuant to 15 C.C.R. § 3007. Section 3007 states, in full: "Inmates may not participate in illegal sexual acts. Inmates are specifically excluded in laws which remove legal restraints from acts between consenting adults. Inmates must avoid deliberately placing themselves in situations and behaving in a manner which is designed to encourage illegal sexual acts." It is not at all clear that CO ███'s report is on its face sufficient to sustain the RVR charge. As of the date of this letter, however, we have not received the final RVR, which we understand was subject to further review. **We request and expect that the RVR report will be considered carefully to determine whether it is sufficient to support the charges against Mr. Fisher.**

Instead of being placed in segregation, Mr. Fisher was returned to A-6. There, Mr. Fisher asked CO ███ why she issued the false RVR. CO ███ responded in a retaliatory fashion, referring to Mr. Fisher's 602 submitted January 27, 2022 in response to CO ███ falsely accusing him of IEX and CO ███'s harassment on January 9, 2022. Mr. Fisher received a copy of the RVR write-up about two weeks later.

We understand that this RVR was not heard until on or about September 12, 2022, despite CDCR regulations requiring hearings to occur within 30 days of an RVR being served, unless certain specific exceptions apply. *See* 15 C.C.R. § 3320(b). The report underlying the purported IEX incident and the unusual delay in the RVR hearing—which finally occurred immediately before Mr. Fisher went before the Board of Parole Hearings and five months after the alleged conduct—suggest that this RVR is false. Mr. Fisher challenged this series of incidents in a 602-1 that he submitted on May 9, 2022. Ex. E.

### C. On May 5, 2022, SAC Officers Denied Mr. Fisher Medical Care for 11 Hours Following an Assault.

On May 5, 2022, at about 12:48 pm, Mr. Fisher was assaulted. At about 1:30 pm, a nurse conducted Mr. Fisher's 7219 evaluation to assess his injuries. *See* **Exhibit G**, May 5, 2022 7219. The nurse documented that Mr. Fisher had an abrasion/scratch above his right eyebrow, scratches on his elbows, and dried blood above his right lip area.

Mr. Fisher was held for approximately 11 hours without justification. *See* **Exhibit H**, Holding Cell Log for Holding Cage # 3 on May 05, 2022. During his 11 hours in the holding cage, Mr. Fisher was denied medical care.

Below is a time line of the events while Mr. Fisher was in the holding cell:




Mr. Fisher's medical records show he required medical care immediately after the assault. In a 2:29 pm medical note, medical staff reported that Mr. Fisher "needs further assessment [sic] and observation in TTA for further medical monitoring patient," and recommended that he be sent "to TTA for further assessment." *See* **Exhibit I**, May 5, 2022 2:29 pm Outpatient Progress Note. Medical staff contacted A Facility custody staff three more times—at 2:42 pm, 3:53 pm, and 5:02 pm—to request that Mr. Fisher be transported to the TTA. *See* **Exhibit J**, May 5, 2022 5:24 pm Progress Note. Not until around 5:00 pm did custody respond, reporting falsely that Mr. Fisher refused medical treatment and a "refusal form [was] completed." *Id.* While in the holding cell, Mr. Fisher never refused treatment, nor did staff discuss the refusal form with him. The May 5, 2022 Refusal Form available on EHRS is not signed by Mr. Fisher. Instead, staff wrote "patient refuses to sign." *See* **Exhibit K**, May 5, 2022 Refusal Form.

The documentation regarding Mr. Fisher's ASU placement is also inconsistent and highly suspicious. In the Incident Report Package, Lieutenant [redacted] noted

that Mr. Fisher suffered a head injury and had blood around his nose, an abrasion on his eyebrow, injuries to his elbows, and jaw pain after the assault. *See* **Exhibit L**, Incident Report Package Log #38394 Supplemental Report at 18, 20, 21. Yet Mr. Fisher remained in a holding cell for 11 hours due, according to Lt. [redacted], to staff waiting for documentation to place Mr. Fisher in ASU. *Id.* at 21. Lieutenant [redacted] further stated that Mr. Fisher did not pass the Ad-Seg placement assessment, so they had to call an offsite psychologist to clear Mr. Fisher. *Id.*

Lt. [redacted]'s explanation of "waiting on all appropriate documentation" for ASU placement is inconsistent with the copy of ASU Placement Notice that Mr. Fisher received the following day. *Id.* The Notice—signed by Lt. [redacted]—states it was served on Mr. Fisher at 4:00 pm on May 5, 2022. *See* **Exhibit M**, May 5, 2022 ASU Placement Notice. The holding cell log for Mr. Fisher also appears to state that Mr. Fisher was cleared for ASU housing as of 5:00pm. *See* Ex. H at 2 (scrawled notation of AOD approval). Lt. [redacted]'s explanation also fails to address why Mr. Fisher was retained in a holding cell for 11 hours pending placement in ASU.

Further, Mr. Fisher did not undergo the ASU Preplacement Assessment until 10:36 pm,[2] approximately 10 hours after the assault. *See* **Exhibit N**, May 5, 2022 ASU Preplacement Assessment. Lt. [redacted]'s explanation for holding Mr. Fisher in the cage for 11 hours because he did not pass the Ad-Seg placement is inconsistent with the fact that the assessment appears to have occurred at 10:36 pm; 10 hours had already passed when the ASU assessment occurred.

As Lt. [redacted] also acknowledged, Mr. Fisher's placement in a holding cell for more than 4 hours was contrary to policy. SAC's "LOP 6 states: 'Every attempt shall be made to not retain an inmate in a holding cell longer than **four** hours.'" Ex. L at 21 (emphasis added). Title 15 requires initial approval of the facility manager or health care staff to place people in holding cells, and "continued retention [in such cells] shall be reviewed a minimum of every four hours." 15 Cal. Code Regs. § 1055. There is no indication that Mr. Fisher's placement in a holding cell was reviewed as required.

When Mr. Fisher was finally evaluated by a psychologist due to failing the ASU Pre-placement assessment, he reported that he continually asked to be seen for his injuries but was never seen. *See* **Exhibit O,** May 6, 2022 Suicide and Self-Harm Evaluation. He further reported "'harassment' by un-named officers on his housing unit - A6 - and that he had been trying to cope with this with his assigned PC, Ms. [redacted]....'"

---

[2] EHRS contains two ASU Pre-Placement Assessments marked "In Error" between 10:15 pm and the final 10:36 pm Assessment.

*Id.* The assessing clinician documented that Mr. Fisher thought his jaw might be broken, and his "noticeable scrapes, wounds, swollen eye and 'busted' lip." *Id.* at 1. Mr. Fisher also told medical staff, "I feel like I might die if I go to sleep and no one will know. I don't want to die, I want to be seen by a doctor." *Id.* The assessing clinician asked that Mr. Fisher "be transferred to TTA for a medical evaluation of injuries." *Id.*

Lt. [redacted]'s explanation of waiting on paperwork does not explain why Mr. Fisher was not sent for medical treatment, while any ASU paperwork was being prepared. Custody staff on the scene of the assault identified multiple injuries to Mr. Fisher, including specifically that he had suffered a head injury. Medical staff repeatedly asked that Mr. Fisher be sent to the TTA for treatment, and each staff member who observed him noted his obvious injuries. Mr. Fisher also reported symptoms consistent with a head injury—dizziness, blurry vision, and vomiting. Finally, at 12:06 am on May 6, 2022, Mr. Fisher arrived at the TTA. *See* **Exhibit P**, May 6, 2022 2:03 am Progress Note. There, he reported blurry vision in both eyes and feeling woozy, as well as jaw pain and that he could not open his mouth fully or "pivot his jaw." *Id.* Nursing staff documented that his jaw was swollen, that he had a contusion and abrasion above his right eyebrow, and multiple abrasions to his hands, elbows, and knees. *Id.* Medical staff cleaned Mr. Fisher's lip laceration. *Id.* At 1:27 am, medical staff notified the on-call provider, who ordered that Mr. Fisher be sent to UC Davis for a head injury. *Id.* While there, doctors sutured the laceration above his lip. *See* **Exhibit Q**, Outside Hospital Records at 2.

Mr. Fisher returned to the prison the following day and was admitted to the MHCB. Mr. Fisher was in the MHCB from May 6 to 16, 2022. During his time in the MHCB, Mr. Fisher repeatedly reported officers' retaliatory behavior. *See* **Exhibit R**, May 7, 2022 SRASHE at 2; and **Exhibit S**, May 9, 2022 MHPC Inpatient Progress Note.

On May 9, Mr. Fisher submitted 602-1 Log # 255170 describing in detail the April 2022 incidents involved CO [redacted], and the aftermath of the May 5 assault. *See* Ex. E.

Despite reporting that he would not feel safe on B-Yard because of his history of witnessing staff misconduct there and completing a declaration about the same, SAC rehoused Mr. Fisher on B-Yard following his discharge from MHCB.

## II. SAC Staff Interfered with Plaintiffs' Counsel's Ability to Communicate with Mr. Fisher on August 4, 2022

On August 4, 2022, Plaintiffs' counsel had a scheduled confidential legal call with Mr. Fisher at 9:30 am. That morning, Mr. Fisher asked multiple officers about his scheduled call and when he would be released for the call. He never was released.

On the same date, around 10:00 am, Plaintiffs' counsel received a call from SAC informing us that Mr. Fisher refused to take our call.

This false refusal is consistent with the pattern of false refusals that Plaintiffs' counsel, Defendants, and the Special Master team have identified as persistent staff misconduct at SAC since at least 2016. It evidences persistent interference with class members' access to counsel.[3]

## III. Effects of Retaliatory Treatment on Mr. Fisher's Wellbeing

The culmination of retaliatory incidents has impacted Mr. Fisher's ability to function and to obtain the mental health care he needs. Because of his real fear of further retaliation, Mr. Fisher isolated and did not attend his EOP mental health treatment groups. Mr. Fisher experiences ongoing frustration with mental health staff not believing that officers actually are retaliating against him; although Mr. Fisher experiences PTSD symptoms, such as paranoia, he justifiably fears further retaliation. Mr. Fisher reports feeling that he may "just snap" due to the ongoing stress and fear. Mental health staff frequently appear to mistake Mr. Fisher's calm demeanor to signify that he is not suffering. For example, in a progress not after the May 5, 2022 assault, the provider documents Mr. Fisher's reports of retaliation and staff misconduct but that his "affect was not consistent with [his] thought content. He spoke matter-of-factly without signs of emotional distress." It seems that mental health staff may over-rely on Mr. Fisher's typically calm demeanor, and on that basis dismiss or discount his reports of distress.

Recently, Mr. Fisher asked to be and was placed at a lower level of care to escape the taunts, threats, and mistreatment by SAC officers in his EOP building. Due, however, to his need for more care than can be provided in CCCMS, Mr. Fisher quickly decompensated and has engaged in multiple instances of serious self-harm.

---

[3] *See* **Exhibit T,** October 24, 2016; December 2, 2016; April 21, 2017 versions Corrective Action Plan ("CAP") for SAC; **Exhibit U,** [redacted] May 5, 2022 letter regarding Ongoing Staff Misconduct at CSP-SAC.

## IV. Immediate Steps Needed to Prevent Further Harm

To address Mr. Fisher's need to live in a safe environment that allows him to receive mental health care, OIA investigators should investigate the continuing course of retaliation and misconduct waged against Mr. Fisher, including, but not limited to, the following specific events:[4]

1. September 2021,

   a. SAC, A-6, CO [REDACTED] retaliating against Mr. Fisher for contacting us, and denying him use of the phone, access to showers, and mental health groups as punishment.

2. January 9, 2022,

   a. SAC, A-6, CO [REDACTED]'s public verbal harassment based on false IEX charges.

   b. SAC A-6, CO [REDACTED]'s statements to other incarcerated people that Mr. Fisher "need to get done like that dude in 7-Block."

   c. SAC A-6, CO [REDACTED] again denying showers, and phone calls as punishment for contacting *Coleman* counsel.

   d. Failure to process Mr. Fisher's initial 602 regarding CO [REDACTED]'s harassment on January 9, 2022.

   e. Anonymous note that said CO [REDACTED] was telling other incarcerated people that Mr. Fisher is a sex offender and that he "needs to go."

3. January 11, 2022

   a. SAC, A-6, CO [REDACTED] loudly telling Mr. Fisher, "I'll tell the whole tier you be in there jacking off to all the females, you fucking weirdo."

---

[4] We understand that ISU conducted a cursory, 15-minute interview of Mr. Fisher related to a small portion of these events and asked him general questions about the same.

4. January 14, 2022,

   a. SAC A-6, multiple correctional officers "randomly" searching Mr. Fisher's cell and harassing him while taking and destroying his personal property.

   b. During the cell search, CO [redacted] telling Mr. Fisher, "This is what snitches get" in front of a lieutenant, two sergeants, and an officer.

5. February 25, 2022,

   a. CO [redacted] telling Mr. Fisher that if he kept complaining, he would beat Mr. Fisher up and charge him with battery, like he had to another incarcerated person.

6. April 20, 2022,

   a. CO [redacted] issuing Mr. Fisher a false RVR as punishment for filing 602s.

7. May 5, 2022,

   a. Facility A staff holding Mr. Fisher in a holding cell for 11 hours without justification and denying him access to medical care despite their knowledge that he had suffered a head injury, among other obvious injuries.

8. August 4, 2022,

   a. SAC staff falsely reporting that Mr. Fisher refused a confidential legal call with Plaintiffs' counsel, interfering with Plaintiffs' ability to communicate with our client.

**Please provide SAC's LOP 6, cited by Lieutenant [redacted] in the incident report package for the May 5 assault on Mr. Fisher. Please also provide the results of the April 20, 2022 RVR once final review is complete.**

///

///

///

///

Please confirm that OIA will be investigating these allegations and produce all associated documentation following the close of the investigation.

Sincerely,

ROSEN BIEN
GALVAN & GRUNFELD LLP

*/s/ Jessica Winter*

By: Jessica Winter

JW:id:etb
Exhibits A-U

cc: *Coleman* Special Master Team
*Coleman* Co-Counsel
*Armstrong* Co-Counsel



# PROOF OF SERVICE

(C.C.P. §§1013(a); 2015.5; 28 U.S.C. §1746)

I, AL GENE FISHER, JR., am over the age of eighteen (18) years, and I (am) (am not) a party to the within cause of action. My address is:

AL GENE FISHER, JR. #J-42468
P.O. BOX 1050
SOLEDAD, CA. 93960

On, FEBURARY 1, 2024, I served the following documents:

28 U.S.C. §1343(a); 42 U.S.C. § 1983

on the below named individual(s) by depositing true and correct copies thereof in the United State mail in Represa, California, with postage fully prepaid thereon, addressed as follows:

1. UNITED STATES DISTRICT COURT
FOR THE EASTERN DISTRICT
501 I STR., STE 4-200
SACRAMENTO, CA. 95814-2322

2.

I have read the above statements and declare under the penalty of perjury of the laws of the State of California that the foregoing is true and correct.

Executed this 1ST day of FEBURARY, 2024, at California State Prison - Sacramento, Represa, California.

(Signature) Al Fisher